Filed 8/3/15

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| CITY OF SAN DIEGO et al., | ) | S199557 |
| | ) | |
| Plaintiffs and Appellants, | ) | Ct.App. 4/1 D057446 |
| | ) | |
| v. | ) | San Diego County |
| | ) | Super. Ct. Nos. |
| BOARD OF TRUSTEES OF THE | ) | GIC855643 |
| CALIFORNIA STATE UNIVERSITY, | ) | GIC855701 |
| | ) | 37-2007-00083692-CU-WM-CTL |
| | ) | 37-2007-00083768-CU-TT-CTL |
| Defendant and Respondent. | ) | 37-2007-00083773-CU-MC-CTL |
| _____ | ) | |

In this case we consider a challenge under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (CEQA) to a decision by the Board of Trustees (Board) of the California State University (CSU) certifying an environmental impact report (EIR). The EIR concerns the Board's project to expand the campus of San Diego State University (SDSU) to accommodate more than 10,000 additional students over the next several years — part of a larger program to expand CSU's statewide enrollment capacity by 107,000. The SDSU project will contribute significantly to traffic congestion off-campus in the City of San Diego. Although the Board has budgeted substantial state and non-state funds to expand its campuses ($9.9 billion), the Board has declined to use those funds, or any of CSU's financial resources, to reimburse other public agencies for its self-determined fair share of the statewide cost of mitigating its projects' off-campus environmental effects ($15 million). Instead, based on dictum in *City of Marina v.*

*Board of Trustees of California State University* (2006) 39 Cal.4th 341 (*Marina*),[1] the Board has taken the position that CSU may not lawfully pay to mitigate the off-campus environmental effects of its projects unless the Legislature makes an appropriation for that specific purpose.  Anticipating the Legislature might not make an earmarked appropriation for mitigation, given the resources already budgeted for campus expansion, the Board has found that mitigation is infeasible and certified the EIR for SDSU based on a statement of overriding considerations, that is, a determination the project offers benefits that outweigh its unmitigated effects.  (See Pub. Resources Code, § 21081, subds. (a)(3) [mitigation infeasible], (b) [overriding benefits]; see also Cal. Code of Regs., tit. 14, § 15000 et seq. (CEQA Guidelines); *id.*, §§ 15091, subd. (a)(3) [findings], 15093 [statement of overriding considerations].)

We granted review to determine whether the Board's EIR complies with CEQA and to reexamine the dictum in *Marina*, *supra*, 39 Cal.4th 341.  We conclude the dictum does not justify the Board's assumption that a state agency may contribute funds for off-site environmental mitigation only through earmarked appropriations, to the exclusion of other available sources of funding.  The erroneous assumption invalidates both the Board's finding that mitigation is infeasible and its statement of overriding considerations.  Accordingly, we will affirm the Court of Appeal's decision directing the Board to vacate its certification of the EIR.

---

[1]     "[A] state agency's power to mitigate its project's effects through voluntary mitigation payments is ultimately subject to legislative control; if the Legislature does not appropriate the money, the power does not exist."  (*Marina*, *supra*, 39 Cal.4th at p. 367; see *id.*, at p. 372 (conc. opn. of Chin, J.) ["the discussion is dictum"].)

# I. BACKGROUND

CSU is a public institution of higher education established by the Legislature in 1960 to offer undergraduate, graduate and professional instruction. (Ed. Code, § 66010.4, subd. (b).) Currently the largest four-year public university in the United States, CSU enrolls 447,000 students and employs 45,000 faculty and staff members on 23 campuses throughout the state. SDSU, one of CSU's campuses, enrolls over 33,000 students and employs 3,000 faculty and staff members on a 280-acre campus in the City of San Diego, eight miles from downtown.

Defendant Board is the governing body of CSU (Ed. Code, § 66600) and the lead agency responsible for preparing and certifying the EIR for SDSU's master plan. (See Pub. Resources Code, §§ 21067 [lead agency], 21100, subd. (a) [duties of lead agency]; see also Ed. Code, § 66606 [Board's powers]). Plaintiffs, who challenge the Board's decision to certify the EIR, are the City of San Diego (City); the San Diego Association of Governments (SANDAG), a regional agency with statutory responsibilities that include transportation and transit; and the Metropolitan Transit System (MTS), a public agency that serves San Diego and SDSU with light rail and buses.

In 2003, the Board directed CSU to take the steps necessary to accommodate a projected long-term increase in enrollment of 107,000 students statewide. To support higher enrollment with additional physical facilities, the Board approved a multi-year capital improvement program budgeting $5.9 billion in state funds and $4 billion in non-state (i.e., nonappropriated) funds.[2] As part of this program, the

---

[2] CSU explains that non-state funds "are provided by mandatory fees, user charges, gifts, and bonds issued by the [Board] or auxiliary organizations. . . . Non-state funded projects include parking lots and structures, student housing, student unions, health centers, stadiums, food service buildings, bookstores, and other facilities . . . ."

Board determined that SDSU should expand to enroll 10,000 more full-time equivalent students by the 2024–2025 academic year. The planned expansion will enlarge SDSU's actual enrollment of full- and part-time students by 11,385, raising total enrollment from 33,441 to 44,826, and also add 1,282 faculty and staff members.

In 2005, the Board prepared an EIR and campus master plan revision (the 2005 EIR) proposing to undertake several construction projects on the SDSU campus. The proposed projects included a housing development for faculty, staff, and graduate students, a research and instructional facility, the expansion of a student residence hall, a new student union building, and a hotel.

In the 2005 EIR, the Board found the proposed projects would contribute significantly to cumulative traffic congestion at several identified locations off-campus. The Board declined, however, to contribute its share of the cost of improving the affected roadways and intersections to the other public agencies responsible for making the necessary improvements (the City and the California Department of Transportation (Caltrans)). Any contribution of funds for off-site mitigation, the Board asserted, would amount to a prohibited assessment of state property (cf. Cal. Const., art. XIII, § 3, subd. (d)) and an unlawful gift of public funds (cf. *id.*, art. XVI, § 6). Based on those assumptions, the Board concluded that SDSU was "not legally responsible for funding or constructing physical road improvements" and that the improvements were instead the responsibility of others. For the same reasons, the Board found that SDSU could not feasibly mitigate its project's traffic impacts and that those impacts would remain significant and unavoidable. Having found mitigation infeasible, the Board on September 21, 2005, certified the 2005 EIR as complete and in accordance with CEQA based on a statement of overriding considerations.

4

On October 20, 2005, the City challenged the Board's decision by filing a petition for writ of mandate in the San Diego County Superior Court. Among other things, the City challenged the Board's assumption that payments for off-site mitigation would represent unlawful assessments or gifts of public funds. At that time, the Board was taking the same position in another case challenging its refusal to mitigate the off-site environmental impacts of a project to expand CSU-Monterey Bay (CSUMB). In that other case, the Court of Appeal for the Sixth Appellate District had filed an opinion accepting the Board's position, we had granted review, and the case was pending in this court. (*City of Marina v. Board of Trustees of California State University* (June 17, 2003, H023158), review granted Oct. 1, 2003, S117816.) On July 31, 2006, we reversed the Sixth District's decision. In our opinion (*Marina*, *supra*, 39 Cal.4th 341), we rejected the Board's arguments against fair-share payments for mitigation and concluded the Board had abused its discretion in certifying the EIR for CSUMB.

In light of our decision in *Marina*, *supra*, 39 Cal.4th 341, the San Diego Superior Court in the case now before us issued a peremptory writ of mandate on September 1, 2006, directing the Board to vacate its decision certifying the 2005 EIR for SDSU. In its writ, the superior court stated that it "retain[ed] jurisdiction . . . until [the court] has determined that [the Board] has complied with CEQA and the views expressed by the California Supreme Court in . . . *Marina* . . . ."

On June 12, 2007, the Board circulated for public comment a new draft EIR and campus master plan revision for SDSU (2007 DEIR). That document, as subsequently revised, finalized and certified by the Board (the 2007 EIR or final 2007 EIR), is the subject of the instant proceeding.

In the 2007 DEIR, the Board proposed to undertake several large construction projects on 55 acres on and adjacent to the SDSU campus. The proposed projects include: (1) Adobe Falls Housing, a 348-unit, 33-acre

5

development of townhouses, condominiums and recreational facilities for faculty and staff, to be funded by "an outside development interest"; (2) the Alvarado Campus, several buildings totaling 612,000 square feet intended for academic, research and medical use, together with a 552,000-square-foot parking structure, to be funded by parking reserves and a future bond sale supported by parking fees; (3) the Alvarado Hotel, a 120-room, 60,000-square-foot hotel to be funded by "partnership arrangements"; (4) a Campus Conference Center of 70,000 square feet to be funded by donors; (5) five new student housing structures totaling 1.4 million square feet to accommodate 3,400 students, replacing two smaller structures, and a related 15,000-square-foot administrative building, to be funded by state revenue bonds; and (6) the renovation and expansion of the Student Union/Aztec Center to include 70,000 square feet of new social and meeting space, recreational facilities, offices, and food and retail services, to be funded by student fees.

In the 2007 DEIR, the Board acknowledged the proposed project would contribute significantly to cumulative traffic congestion off-campus in San Diego. The Board predicted the project, in the near term, would significantly impact six intersections, three street segments and one freeway ramp meter, and in the longer term (by 2030), nine more intersections, five more street segments, and four freeway mainline segments. For each affected location, the Board estimated the project's "fair-share contributions" to mitigate increased congestion; those contributions average 12 percent. The Board also identified the specific improvements that would mitigate most of the impacts to below a level of significance. The Board offered no assurance, however, that it would pay SDSU's fair share of the mitigation costs. Instead, the Board made the following statement, citing *Marina*, *supra*, 39 Cal.4th 341, as authority: "Fair-share mitigation is recommended that would reduce the identified impacts to a level

6

below significant. However, the university's fair-share funding commitment is necessarily conditioned up[on] requesting and obtaining funds from the California Legislature. If the Legislature does not provide funding, or if funding is significantly delayed, all identified significant impacts would remain significant and unavoidable."

In public comments on the 2007 DEIR, the City objected that the Board had misinterpreted *Marina*, *supra*, 39 Cal.4th 341, and violated CEQA by failing to guarantee the proposed mitigation measures would be implemented.**3** A series of meetings followed in which representatives of the Board, the City and Caltrans discussed SDSU's duty to mitigate off-campus traffic impacts. When negotiations failed, the Board reiterated its position that any mitigation payment by SDSU would be conditioned on a future appropriation and stated it would request $6,437,000 from the Legislature for that purpose. In negotiations with Caltrans the Board agreed the project's "fair-share responsibility" for freeway impacts would be $890,000 in the near term and $9,250,000 in the long term (by 2030). But the Board disclaimed any obligation to pay its share. The Board adhered to these positions in the final 2007 EIR, explaining them in the following series of statements setting out the Board's interpretation of *Marina*:

"Under the California Supreme Court's decision in [*Marina*, *supra*], 39 Cal.4th 341, CSU/SDSU is obligated to request funding from the state Legislature to pay its fair-share of the mitigation costs associated with the identified significant impacts. . . . Pursuant to that obligation, CSU will, following the

---

**3** (See Pub. Resources Code, § 21081.6, subd. (b) ["A public agency shall provide that measures to mitigate or avoid significant effects on the environment are fully enforceable through permit conditions, agreements, or other measures."]; see CEQA Guidelines, § 15126.4, subd. (a)(2) [to the same effect].)

7

normal state budget timelines and process, submit a budget request to the state Legislature and Governor that will include a mitigation dollar amount consistent with CSU's fair-share contribution towards implementation of the necessary roadway improvements within the jurisdiction of local agencies."

"The intent of the California Supreme Court's decision in [*Marina*, *supra*, 39 Cal.4th 341] is to ensure that significant impacts under CEQA are feasibly mitigated and that localities recover the cost of CSU's impacts. The underlying logic of that decision does not apply to other state agencies, such as [Caltrans], as these other state agencies are funded from the same source as CSU. Instead, CSU/SDSU will support Caltrans in its efforts to obtain the level of funding agreed to by the parties through the annual state budget process, and will look to the [City] and [SANDAG] to join in that support."

"However," the Board continued, "because CSU cannot guarantee that its request to the Governor and the Legislature for the necessary mitigation funding will be approved, or that any funding request submitted by Caltrans will be approved, or that the funding will be granted in the amount requested, or that the public agencies will fund the mitigation improvements that are within their responsibility and jurisdiction, the identified significant impacts are determined to be significant and unavoidable." For the same reasons, the Board found that "there are no feasible mitigation measures that would reduce the identified significant impacts to a level below significant. Therefore, these impacts must be considered unavoidably significant even after implementation of all feasible transportation/circulation and parking mitigation measures."

In August 2007, before certifying the 2007 EIR, the Chancellor of CSU submitted to the Department of Finance a "2008/09 Capital Outlay Budget Change Proposal" requesting the Legislature create a "systemwide fund for the mitigation of off-campus impacts related to growth and development on CSU campuses."

8

Noting that six CSU campuses (Bakersfield, Fresno, Long Beach, Monterey Bay, San Diego and San Francisco) were currently revising their master plans, the Chancellor requested a total of $15 million to mitigate off-campus environmental effects at all locations, including $10.5 million for SDSU. The Board's request did not appear in the Governor's proposed budget, the May revision or the 2008 Budget Act. The Board repeated the request in each of the next two years, apparently without any different result.

On November 13 and 14, 2007, the Board conducted a public meeting to certify the 2007 EIR. Representatives of the City, SANDAG, MTS and Caltrans reiterated previously expressed concerns about the Board's approach to mitigation and its interpretation of *Marina*, *supra*, 39 Cal.4th 341. At the meeting's conclusion, the Board approved a resolution adopting the EIR's findings, certifying the EIR "as complete and in compliance with CEQA," and approving the Campus Master Plan Revision for SDSU.

The Board's resolution, in summary, finds the project will have significant impacts on traffic; that the impacts cannot feasibly be mitigated given the Board's interpretation of *Marina*, *supra*, 39 Cal.4th 341; and that the impacts are unavoidable but nevertheless acceptable because the project offers overriding benefits that justify proceeding despite the unmitigated effects. The Board's statement of overriding considerations includes a wide-ranging list of the anticipated benefits of campus expansion, which the Board summarizes as "satisfying statewide educational demand, improving educational opportunities for underrepresented populations, creating jobs, and fueling economic growth."

On December 14, 2007, plaintiffs City, SANDAG and MTS filed petitions for writ of mandate in the San Diego Superior Court challenging the Board's decision to certify the 2007 EIR. After consolidating the petitions, the court issued a statement of decision and judgment rejecting all of plaintiffs' claims,

9

denying the petitions for writ of mandate, and discharging the 2006 peremptory writ.

Plaintiffs appealed the superior court's decision. The Court of Appeal reversed in part, affirmed in part, and directed the superior court to issue a writ of mandate ordering the Board to vacate its decision certifying the 2007 EIR. Among other things, the Court of Appeal held the Board had erred in relying on *Marina*, *supra*, 39 Cal.4th 341, to find off-site mitigation infeasible and, based on that finding, to conclude that overriding considerations justified proceeding with the Master Plan despite the unmitigated environmental effects.[4] We granted the Board's petition for review.[5]

## II. DISCUSSION

The main issue before us is a question of law: Does the dictum in *Marina*, *supra*, 39 Cal.4th 341, support the Board's assumption in the 2007 EIR that CSU may not contribute its fair share to mitigate the off-campus environmental effects

---

[4] The Court of Appeal also held the Board (1) had not adequately investigated and addressed the project's impacts on public transit, (2) had found, without the support of substantial evidence, that the project would have no impact on transit, and (3) had improperly deferred mitigation of impacts due to vehicular traffic. We excluded these additional issues from review on our own motion. (See Cal. Rules of Court, rule 8.516 (a)(1).)

[5] The Board's interpretation of *Marina*, *supra*, 39 Cal.4th 342, potentially affects many other CEQA proceedings given CSU's plan to expand campuses across the state. We have granted and held a similar case involving a challenge to the Board's EIR for a project to expand CSU-East Bay. (*City of Hayward v. Trustees of California State University* (May 30, 2012, A131412, A131413, A132423 & A132424) review granted Oct. 17, 2012, S203939.) Also, the Legislative Analyst's Office notes the Board has relied on its interpretation of *Marina* in two other instances to make fair-share payments for off-site mitigation contingent upon legislative funding. (Legis. Analyst's Off., Analysis of the 2008–2009 Budget Bill (Feb. 20, 2008), Education, p. E-173.)

10

of campus expansion unless the Legislature makes an appropriation for that specific purpose?  The assumption critically underlies both the Board's finding that mitigation is infeasible and its statement of overriding considerations.  We conclude the answer is no:  The *Marina* dictum does not justify the assumption.  The Board's other contentions also lack merit.

### A. The standard of review.

CEQA sets out the applicable standard of review:  "In any action or proceeding . . . to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion.  Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence."  (Pub. Resources Code, § 21168.5.)

The Board's finding that mitigation is not feasible without an earmarked appropriation depends for its validity on a "question of law — a type of question we review de novo."  (*Marina*, *supra*, 39 Cal.4th at p. 355.)  "De novo review of legal questions is . . . consistent with the principle that, in CEQA cases, ' "[t]he court does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an "informative document." ' " (*Id.* at p. 356, quoting *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392.)  "An EIR that incorrectly disclaims the power and duty to mitigate identified environmental effects based on erroneous legal assumptions is not sufficient as an informative document" (*Marina*, at p. 356), and "an agency's 'use of an erroneous legal standard constitutes a failure to proceed in a manner required by law' " (*id.* at p. 355, quoting *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 88).

11

**B. The *Marina* decision.**

As noted, our decision in *Marina*, *supra*, 39 Cal.4th 341, addressed a challenge to the Board's EIR for an earlier campus expansion project. In that EIR, the Board had found that to expand CSUMB would significantly affect drainage, water supply, traffic, wastewater management and fire protection throughout Fort Ord, the former military base on which the campus was located, as well as vehicular traffic in the neighboring municipalities of Seaside and the City of Marina. (*Id.* at pp. 349–350.) Nevertheless, the Board refused to share the cost of mitigating these impacts with the public entities responsible for undertaking the necessary infrastructure improvements. Any payment for that purpose, the Board asserted in its EIR, would amount to an unlawful assessment of CSU or a gift of public funds. (*Id.* at pp. 352–353.) Based on these legal assumptions, the Board found that mitigation was infeasible and that overriding considerations justified certifying the EIR and approving the Master Plan despite the unmitigated effects. (*Id.* at pp. 351–354.)

We concluded the Board had abused its discretion in certifying the EIR because the finding of infeasibility and statement of overriding considerations depended on erroneous legal assumptions. (*Marina*, *supra*, 39 Cal.4th at pp. 368–369.) Prominent among those assumptions was that the campus's geographical boundaries defined the extent of the Board's duty to mitigate. To the contrary, as we explained, "CEQA requires a public agency to mitigate or avoid its projects' significant effects not just on the agency's own property but '*on the environment*' (Pub. Resources Code, § 21002.1, subd. (b), italics added), with 'environment' defined for these purposes as 'the physical conditions which exist *within the area which will be affected by a proposed project*' (*id.*, § 21060.5, italics added)." (*Marina*, at p. 360.)

12

The same erroneous assumption had also led the Board to find that off-site mitigation was the responsibility of other agencies. (*Marina*, 39 Cal.4th at p. 366.) CEQA does permit a lead agency to determine that mitigation measures necessary to avoid a project's environmental effects "are within the responsibility and jurisdiction of another public agency and have been, or can and should be, adopted by that other agency." (Pub. Resources Code, § 21081, subd. (a)(2).) However, as we explained, the Board shared with other agencies the responsibility for mitigating CSUMB's effects on regional infrastructure, and a lead agency may disclaim responsibility "only when the other agency said to have responsibility has *exclusive* responsibility." (*Marina*, at p. 366, citing CEQA Guidelines, § 15091, subd. (c) ["The finding in subdivision (a)(2) shall not be made if the agency making the finding has concurrent jurisdiction with another agency to deal with identified feasible mitigation measures or alternatives"].)

Having explained that the Board's duty to mitigate extended beyond the boundaries of the campus, we dismissed as "beside the point" the Board's argument that it "lack[ed] the power to construct infrastructure improvements away from campus on land [the Board did] not own and control . . . ." (*Marina*, *supra*, 39 Cal.4th at p. 367.) "Certainly," we acknowledged, "the [Board] may not enter the land of others to widen roads and lay sewer pipe; CEQA gives the [Board] no such power. (See Pub. Resources Code, § 21004 ['[i]n mitigating or avoiding a significant effect of a project on the environment, a public agency may exercise only those express or implied powers provided by law other than this division.'].) [But] CEQA does not," we continued, "limit a public agency's obligation to mitigate or avoid significant environmental effects to effects occurring on the agency's own property. (See Pub. Resources Code, §§ 21002.1, subd. (b), 21060.5.) CEQA also provides that '[a]ll state agencies . . . shall request in their budgets the funds necessary to protect the environment in relation to

13

problems caused by their activities.' (*Id.*, § 21106.) Thus," we concluded, "if the [Board] cannot adequately mitigate or avoid CSUMB's off-campus environmental effects by performing acts on the campus, then to pay a third party . . . to perform the necessary acts off campus may well represent a feasible alternative." (*Marina*, at p. 367.)

### C. The *Marina* dictum.

The discussion just quoted led to the dictum we granted review to reexamine. That dictum appears in the following paragraph, which imagines possible limitations of our holding that the Board shared with other agencies the responsibility to mitigate the off-site environmental effects of its project. The dictum on which the Board relies appears in the sentence set out below in italics:

"To be clear, we do not hold that the duty of a public agency to mitigate or avoid significant environmental effects (Pub. Resources Code, § 21002.1, subd. (b)), combined with the duty to ask the Legislature for money to do so (*id.*, § 21106),[6] will always give a public agency that is undertaking a project with environmental effects shared responsibility for mitigation measures another agency must implement. Some mitigation measures cannot be purchased, such as permits that another agency has the sole discretion to grant or refuse. *Moreover, a state agency's power to mitigate its project's effects through voluntary mitigation payments is ultimately subject to legislative control; if the Legislature does not appropriate the money, the power does not exist.* For the same reason, however, for the [Board] to disclaim responsibility for making such payments before [it has]

---

**6**     " 'All state agencies, boards, and commissions shall request in their budgets the funds necessary to protect the environment in relation to problems caused by their activities.' (Pub. Resources Code, § 21106.)" (*Marina*, *supra*, 39 Cal.4th at p. 367, fn. 16.)

14

complied with [its] statutory obligation to ask the Legislature for the necessary funds is premature, at the very least.  The superior court found no evidence the [Board] had asked the Legislature for the funds.  In [its] brief to this court, the [Board] acknowledge[s] [it] did not budget for payments [it] assumed would constitute invalid assessments . . . .  That assumption, as we have explained, is invalid." (*Marina*, *supra*, 39 Cal.4th at p. 367, italics added.)

The italicized sentence embodied dictum rather than a principle necessary to our decision that the Board had erroneously disclaimed responsibility for mitigation.  (See *Manufacturers Life Ins. Co. v. Superior Court* (1995) 10 Cal.4th 257, 287 [" 'Dictum is the "statement of a principle not necessary to the decision." ' "]; see also *Marina*, *supra*, 39 Cal.4th at p. 372 (conc. opn. of Chin, J.) ["the discussion is dictum"].)  Indeed, our opinion unmistakably identifies the sentence as dictum by describing the argument to which it responded as "premature, at the very least." (*Marina*, at p. 367.)  We called the argument "*premature*" because the Board had not yet asked the Legislature for funding, and "premature, *at the very least*," to indicate the argument might lack merit even if properly presented.

### 1. The Marina dictum does not justify the Board's position.

In any event, the *Marina* dictum does not justify the Board's position that CSU may contribute funds for off-campus environmental mitigation only through an appropriation designated for that specific purpose, i.e., an earmarked appropriation.[7]  Several reasons lead us to this conclusion:

---

[7]     We are aware of no evidence that any other state agency interprets *Marina*, *supra*, 39 Cal.4th 341, in the same way as the Board.  Significantly, the Legislative Analyst's Office has noted that the University of California (UC) and the California Community Colleges (CCC) do not request earmarked appropriations for off-campus environmental mitigation.  Instead, UC "directs

*(footnote continued on next page)*

15

First, to read the *Marina* dictum as saying anything about earmarked appropriations is strained. No such argument was made by the Board or addressed in the opinion. Neither does the *Marina* dictum offer useful guidance about a public agency's power to mitigate the environmental effects of its projects. The dictum's most important clause — "if the Legislature does not appropriate the money, the power does not exist" (*id.* at p. 367) — is simply an overstatement. In mitigating the effects of its projects, a public agency has access to all of its discretionary powers and not just the power to spend appropriations. (Pub. Resources Code, § 21004.)[8] Those discretionary powers include such actions as adopting changes to proposed projects, imposing conditions on their approval, adopting plans or ordinances to control a broad class of projects, and choosing alternative projects. (See CEQA Guidelines, § 15002, subd. (h).) Moreover, some agencies such as CSU enjoy some discretion over the use of appropriations (see, e.g., Ed. Code, §§ 89770, 89771, 89773, 90083 [CSU may use part of general

---

*(footnote continued from previous page)*

funding from within its [own] budget (including nonstate funds) to compensate local agencies for off-campus infrastructure improvements," and CCC "views local college districts as responsible for negotiating with and funding fair-share payments to local governments." (Legis. Analyst's Off., Analysis of the 2008–2009 Budget Bill, *supra*, Education, p. E-175.) In the same document, the Legislative Analyst's Office also noted that, "the *Marina* decision . . . does not explicitly state that CSU is no longer responsible to mitigate off-campus impacts if the Legislature denies funding." (*Id.*, at p. E-173.)

[8]     "In mitigating or avoiding a significant effect of a project on the environment, a public agency may exercise only those express or implied powers provided by law other than this division [CEQA]. However, a public agency may use discretionary powers provided by such other law for the purpose of mitigating or avoiding a significant effect on the environment subject to the express or implied constraints or limitations that may be provided by law." (Pub. Resources Code, § 21004.)

16

support appropriation for capital projects]) and access to non-state funds (see *ante*, at p. 3 & fn. 2). The Board, in its own words, "has never claimed that it lacks *all* discretion to prioritize the use of its non-state funds."

Second, the proposition that a state agency may pay mitigation costs only through an appropriation earmarked for that purpose is incorrect. Neither CEQA itself, *Marina*, 39 Cal.4th 341, nor any other decision suggests that mitigation costs for a project funded by the Legislature cannot appropriately be included in the project's budget and paid with the funds appropriated for the project. Indeed, such a procedure would appear to represent the most natural interpretation of CEQA, which directs that "[a]ll state agencies . . . shall request in their budgets the funds necessary to protect the environment in relation to problems caused by their activities." (Pub. Resources Code, § 21106; cf. *County of San Diego v. Grossmont-Cuyamaca Community College Dist.* (2006) 141 Cal.App.4th 86, 101–105 [district incorrectly found in EIR that funds appropriated for construction project could not feasibly be used to mitigate project's off-site traffic impacts].)

Furthermore, all but one of the new physical facilities proposed in the 2007 EIR are to be financed with nonappropriated funds. These facilities include the proposed Adobe Falls Housing, the Alvarado Campus, the Alvarado Hotel, the Campus Conference Center and the Student Union expansion. (See *ante*, at pp. 5-6.) The Board's power to participate in such projects logically embraces the power to ensure that mitigation costs attributable to those projects are included in the projects' budgets. (Cf. Ed. Code, §§ 90064 [Board "may use for the payment of the costs of acquisition, construction or completion of any project any funds made available to the board by the State of California or any other funds provided by the board from any source"], 66606 [Board has "full power and responsibility in the construction and development of any state university campus, and any buildings or other facilities or improvements connected with" CSU].)

17

Third, no provision of CEQA conditions the duty of a state agency to mitigate its projects' environmental effects on the Legislature's grant of an earmarked appropriation. Mitigation is the rule: "Each public agency shall mitigate or avoid the significant effects on the environment of projects that it carries out or approves whenever it is feasible to do so." (Pub. Resources Code, § 21002.1, subd. (b).) The Legislature has expressly subjected the Board's decisions concerning campus master plans to the requirements of CEQA (*id.*, § 21080.09, subd. (b)), including the requirement of mitigation (*id.*, § 21002.1, subd. (b)). When the Legislature has wanted to exempt the Board from those requirements, it has done so explicitly. (See *id.*, § 21080.9 [concerning adoption by CSU and other agencies of long-range land use plans subject to California Coastal Act (*id.*, § 30000 et seq.)].) No such exception can reasonably be inferred from the statute the *Marina* dictum purported to interpret (Pub. Resources Code, § 21106; see *Marina*, 49 Cal.4th at p. 367), which simply directs state agencies to include mitigation costs in their budgets.

Fourth and finally, the Board's interpretation of the *Marina* dictum is mistaken because it depends on a legally unsupportable distinction between environmental impacts occurring on the project site and those occurring off-site. CEQA draws no such distinction for purposes of mitigation. Instead, CEQA defines the "environment" as "the physical conditions which exist *within the area which will be affected by a proposed project*" (Pub. Resources Code, § 21060.5, italics added) and mandates that "[e]ach public agency shall mitigate or avoid the significant effects *on the environment* of projects that it carries out or approves whenever it is feasible to do so" (*id.*, 21002.1, subd. (b), italics added). Indeed, this point represents one of *Marina*'s main holdings. (See *Marina*, *supra*, 39 Cal.4th at pp. 359–360, 367.) In the 2007 EIR, the Board commits to undertake a wide variety of mitigation measures on the SDSU campus (e.g., constructing noise

18

barriers, preserving on-site native plant habitats, creating wetlands, and incorporating flow control measures to prevent erosion).  If these on-site mitigation measures can be properly funded through the project budget without an earmarked appropriation, then so too can off-site mitigation measures.

*2. The Board's proposed rule entails unreasonable consequences.*

Unreasonable consequences would follow from the Board's proposed rule that fair-share payments for off-site mitigation may be funded only with an appropriation earmarked for that purpose, and that without such an appropriation mitigation is infeasible.

First, such a holding would logically apply to all state agencies, thus in effect forcing the Legislature to sit as a standing environmental review board to decide on a case-by-case basis whether state agencies' projects will proceed despite unmitigated off-site environmental effects.  Yet CEQA has never been applied in this manner, and nothing in its language or history suggests it should be so applied.  CEQA requires not the Legislature but the responsible agency to determine whether and how a project's effects can feasibly be mitigated (Pub. Resources Code, § 21081, subd. (a)(1)–(3)), to include mitigation costs in the budget (*id.*, § 21106), and if mitigation is infeasible to decide whether the project should nevertheless proceed based on a statement of overriding considerations (*id.*, § 21081, subd. (b)).  The Board suggests we should treat CSU differently than other agencies in this respect because CSU has different missions and funding directives than other agencies.  But the Board has identified no statute or regulation that modifies the requirements of CEQA for projects undertaken by CSU.  Rather, the Legislature has declared that the whole of CEQA applies to the Board's decision to approve the long-range development plan for a campus.  (*Id.*, § 21080.09, subd. (b).)

19

Second, under the rule the Board proposes, if the Legislature did not make an earmarked appropriation for mitigating the off-site effects of a particular state project but the responsible state agency nevertheless decided to proceed without mitigation, the cost of addressing that project's contribution to cumulative impacts on local infrastructure would fall upon local and regional governmental agencies. (Cf. *Marina*, *supra*, 39 Cal.4th at pp. 349–350.) Such a rule would impose a financial burden on local and regional agencies, which may not recover fees to mitigate the environmental impacts of state projects from other developers. This is because mitigation fees imposed on a project must be reasonably related and roughly proportional to that project's impacts. (See Gov. Code, § 66001, subds. (a)(3)–(4), (b) & (g) [the Mitigation Fee Act]; *Dolan v. City of Tigard* (1994) 512 U.S. 374, 391 [5th Amend. requires " 'rough proportionality' "]; *Ehrlich v. City of Culver City* (1996) 12 Cal.4th 854, 866–867 [construing the Mitigation Fee Act in light of *Dolan*]; CEQA Guidelines, §§ 15041, subd. (a) [incorporating *Dolan* standard], 15126.4, subd. (a)(4)(B) [incorporating *Dolan* and *Ehrlich* standards].)

Third, under the Board's proposed rule, off-site mitigation would likely be found infeasible for many, if not all, state projects that receive non-state funding, and more such projects would proceed without mitigation pursuant to statements of overriding considerations. Because a state agency's power to participate in such projects[9] logically entails the power to ensure that mitigation costs are included in the projects' budgets, state agencies cannot necessarily expect the Legislature to appropriate state funds to mitigate such projects' environmental effects. In any event, a decision by this court adopting the Board's proposed rule

---

[9] Here, for example, the proposed Adobe Falls Housing, Alvarado Campus, Alvarado Hotel, and Campus Conference Center. (See *ante*, at pp. 5-6.)

could not compel the Legislature to make any such appropriation. (See *Mandel v. Myers* (1981) 29 Cal.3th 531, 540 [separation of powers generally prohibits a court from directly ordering the Legislature to enact a specific appropriation].)

Taken together, the consequences of adopting the Board's proposed rule that off-site mitigation may be funded only through appropriations for that specific purpose would substantially impair the fundamental statutory directive that "[e]ach public agency shall mitigate or avoid the significant effects on the environment of projects that it carries out or approves whenever it is feasible to do so." (Pub. Resources Code, § 21002.1, subd. (b).) To adopt the proposed rule would also represent a sharp, unwarranted departure from prior decisions recognizing "the Legislature intended [CEQA] to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language" (*Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 259; see *Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112 [same]). We thus decline to adopt it.

### 3. The Board's new arguments.

In support of its finding that off-site mitigation may be funded only through an appropriation for that specific purpose, the Board offers three new arguments not presented below. None of these arguments has merit.

### a. Education Code section 67504.

First, the Board argues the Legislature codified the Board's understanding of *Marina*, *supra*, 39 Cal.4th 367, in a 2009 amendment to Education Code section 67504. The new provision, which does not amend CEQA, was part of a comprehensive amendment to the Education Code intended to "refine higher education reporting requirements to provide for more effective, manageable, and transparent reporting by the higher education segments." (Stats. 2009, ch. 386, § 2

21

[uncodified provision].)  The specific provision applicable to CSU refers to *Marina* only as the occasion for expressing "the intent of the Legislature that [CSU] take steps to reach agreements with local public agencies regarding the mitigation of off-campus impacts related to campus growth and development." (Ed. Code, § 67504, subd. (d)(1).)  The statute refers to the *Marina* decision, and not to its dictum or the Board's interpretation of that dictum, and indicates no limitation on the Board's duty to mitigate off-site impacts.  Indeed, the statute requires CSU to "take steps to reach agreements with local public agencies regarding the mitigation of off-campus impacts related to campus growth and development" (Ed. Code, § 67504, subd. (d)(1)) and to report on "*payments made by the campus for the mitigation of off-campus impacts*" (*id.*, subd. (d)(2), italics added), thereby suggesting the Legislature assumed the Board would in fact make such payments.  The statute's legislative history mentions *Marina* only in setting out the text of the proposed statutory language and contains nothing to suggest the Legislature intended to incorporate the Board's view of that case.

### b. Government Code section 13332.15.

Next, the Board contends the Legislature's failure to grant its request for an earmarked appropriation to mitigate off-site environmental effects has the effect of prohibiting CSU from spending any other public funds for that purpose, even funds generally appropriated for campus expansion.  The Board relies on Government Code section 13332.15, which provides that "[n]o appropriation may be combined or used in any manner . . . to achieve any purpose which has been denied by any formal action of the Legislature."  Neither the judiciary nor the Legislature has defined "formal action" (*ibid.*) in this context.  At a minimum,

22

however, the plain meaning of the statutory language would seem to require an official action of the Legislature acting *as such*, that is, as a body.**10**

Consistent with this understanding, courts have assumed the statutory requirement of formal action has been satisfied when the Legislature has deleted an appropriation proposed in a budget bill (e.g., *County of Sacramento v. Loeb* (1984) 160 Cal.App.3d 446, 459 [ultimately holding Government Code section 13332.15 did not apply retroactively]) or when the Legislature has included in the Budget Act language barring a specific use of funds (e.g., *Tirapelle v. Davis* (1993) 20 Cal.App.4th 1317, 1324 [Budget Act's direction that funding reductions be applied to employee compensation implicitly barred agencies from using funds allotted for other purposes to compensate employees]).

Here, in contrast, the Board has not shown the Legislature took any action, let alone a formal one acting as a body, on the Board's request during the 2008–2009 budget process to create a fund to mitigate the off-site environmental effects of campus expansion. The Legislature had no occasion to act on the request because, as noted, the Board's request did not appear in the Governor's proposed budget, the May revision or the Budget Act. The Board does not assert that its similar requests in each of the following two years produced any different result.

---

**10**     In *Mandel v. Myers*, *supra*, 29 Cal.3d 531, 545–546, we declined to decide whether a legislative *committee's* deletion of a proposed appropriation from a budget bill amounted to "formal action" within the meaning of a provision (Stats. 1978, ch. 359, § 15, p. 1006 [1978–1979 Budget Act]) similar to, but predating, Government Code section 13332.15 (added by Stats. 1983, ch. 323, § 44, p. 970). We did not reach the issue because we decided that language in the act barring the State Controller from paying a judgment against the Department of Health Services out of funds appropriated from that agency's operating expenses violated the separation of powers (Cal. Const., art. III, § 3) by impermissibly readjudicating the merits of a final judgment.

23

### c. Education Code section 66202.5.

In its final new argument on this point, the Board contends the Legislature in Education Code section 66202.5 has signaled its intent that CSU's "enrollment expansion," including off-campus environmental mitigation related to expansion, is to be funded only through "Budget Act appropriations."  To the contrary, the cited statute as relevant here provides only that "[t]he State of California reaffirms its historic commitment to ensure adequate resources to support enrollment growth, within the systemwide academic and individual campus plans to accommodate eligible California freshmen applicants and eligible California Community College transfer students . . . ."  (*Ibid.*)  The statute does not say that only appropriated funds may be used for campus expansion.  So construed, the statute would contradict Education Code section 90064, which expressly permits the Board to use, in addition to appropriated funds, "any other funds provided by the board from any source" to pay for capital projects.  So construed, section 66202.5 would also be very difficult to reconcile with the Board's decision to use nonappropriated funds for five of the six construction projects proposed in the 2007 EIR.  (See *ante*, at pp. 5-6.)

Not conceding the point, the Board argues that "when the Legislature intends CSU to use non-state funding or a mixture of state and non-state sources to accomplish statutory objectives, the Legislature expressly states that intention."  In support, the Board cites statutes encouraging the Board to seek additional sources of revenue to ensure equal athletic opportunities for male and female students (Ed. Code, § 66016), and to fund programs for disabled students (*id.*, § 67310, subd. (e)).  But nothing in those statutes purports to limit Education Code section 90064, which expressly authorizes the Board to use nonappropriated funds for capital projects.

24

In conclusion, we reject the Board's assumption that the feasibility of mitigating its project's off-site environmental effects depends on a legislative appropriation for that specific purpose. The erroneous assumption invalidates the Board's finding of infeasibility because the use of an erroneous legal standard constitutes a failure to proceed in a manner required by law. (See *Marina*, *supra*, 39 Cal.4th at p. 355; Pub. Resources Code, § 21168.5.) The error also invalidates the Board's statement of overriding considerations, because "CEQA does not authorize an agency to proceed with a project that will have significant, unmitigated effects on the environment, based simply on a weighing of those effects against the project's benefits, unless the measures necessary to mitigate those effects are truly infeasible." (*Marina*, pp. 368–369.) For these reasons, the Court of Appeal correctly directed the issuance of a writ of mandate ordering the Board to vacate its decision certifying the 2007 EIR.

### D. Further Proceedings.

The Court of Appeal, after rejecting the Board's interpretation of *Marina*, *supra*, 39 Cal.4th 341, and ordering the Board to vacate its certification of the 2007 EIR, offered the following remarks as guidance for further proceedings: "The availability of potential sources of funding other than the Legislature for offsite mitigation measures should have been addressed in the DEIR and [Final EIR] and all of those potential sources should not be deemed 'infeasible' sources for CSU's 'fair-share' funding of offsite mitigation measures without a comprehensive discussion of those sources and compelling reasons showing those sources cannot, as a matter of law, be used to pay for mitigation of the significant offsite environmental effects of the Project."

In light of the Court of Appeal's remarks, the Board asks us to decide whether particular sources of funding may legally be used for off-site mitigation.

25

No such question is properly before us.[11]  This is because the Board, in the 2007 EIR, went no further in considering the feasibility of fair-share mitigation payments than to assume incorrectly, based on the dictum in *Marina*, *supra*, 39 Cal.4th 341, that such payments would require an appropriation for that specific purpose.  Our decision rejecting the Board's interpretation of *Marina* will preclude the Board from once again finding mitigation infeasible on the same basis.  Furthermore, a commitment by the Board to pay SDSU's fair share of off-site mitigation costs would not necessarily require any discussion of funding sources.

Arguing more broadly, the Board contends that "the notion of readily available 'alternative funding' is a fallacy" and that to reallocate funds for off-site mitigation could only result in the underfunding of CSU's core educational function.  "The EIR approval process," the Board continues, "should not be used to compel CSU to demonstrate . . . that its budget has adequately balanced competing educational and environmental demands.  There is simply no objective legal standard by which to adjudicate whether CSU's revenues would be better spent on more classrooms or more traffic lights."  These arguments misconceive the Board's responsibilities under CEQA.  As we explained in *Marina*, *supra*, 39 Cal.4th 341, "while education may be CSU's core function, to avoid or mitigate

---

[11]    We reiterate, however, that the Board's power to undertake campus-expansion projects, whether paid by state or nonstate funds, logically embraces the power to ensure that mitigation costs attributable to those projects are included in the projects' budgets.  We also observe that recently enacted Education Code sections 89770, 89771, 89773 and 90083 (Stats. 2014, ch. 34, §§ 24–25), added by Senate Bill No. 860 (2013-2014 Reg. Sess.) expressly permit the Board to use up to 12 percent of CSU's annual general support appropriation to pay for capital expenditures and capital outlay projects, including campus expansion.  (Cf. Ed. Code, §§ 90061, 90064 [Board's powers over construction projects]; *id.*, §§ 89750, 89753 and 89754 [Board's control over appropriations generally].)

the environmental effects of its projects is also one of CSU's functions. This is the plain import of CEQA, in which the Legislature has commanded that '[*e*]*ach public agency* shall mitigate or avoid the significant effects on the environment of projects that it carries out or approves whenever it is feasible to do so.' " (*Marina*, at pp. 360.)

We expect the Board, in any new EIR, will proceed in accordance with CEQA's standards and procedures, including its provisions for public comment, and make all required findings in good faith and on the basis of substantial evidence. When made in accordance with CEQA, "an agency's decision that the specific benefits a project offers outweigh any environmental effects that cannot feasibly be mitigated, while subject to review for abuse of discretion (Pub. Resources Code, § 21168.5), lies at the core of the lead agency's discretionary responsibility under CEQA and is, for that reason, not lightly to be overturned." (*Marina*, *supra*, 39 Cal.4th at p. 368.) However, "CEQA does not authorize an agency to proceed with a project that will have significant, unmitigated effects on the environment, based simply on a weighing of those effects against the project's benefits, unless the measures necessary to mitigate those effects are truly infeasible. Such a rule, even were it not wholly inconsistent with the relevant statute (*id.*, § 21081, subd. (b)), would tend to displace the fundamental obligation of '[e]ach public agency [to] mitigate or avoid the significant effects on the environment of projects that it carries out or approves whenever it is feasible to do so" (*id.*, § 21002.1, subd. (b))." (*Marina*, at pp. 368–369.)

27

### III. CONCLUSION

The judgment of the Court of Appeal is affirmed and remanded for further proceedings consistent with this opinion.

**WERDEGAR, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** City of San Diego v. Board of Trustees of California State University
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 201 Cal.App.4th 1134
**Rehearing Granted**

_____

**Opinion No.** S199557
**Date Filed:** August 3, 2015
_____

**Court:** Superior
**County:** San Diego
**Judge:** Thomas P. Nugent
_____

**Counsel:**

Jan I. Goldsmith, City Attorney, Donald R. Worley, Andrew Jones and Daniel Bamberg, Assistant City Attorneys, Donald R. Worley, Assistant City Attorney and Christine M. Leone, Deputy City Attorney, for Plaintiffs and Appellants City of San Diego and Redevelopment Agency of the City of San Diego.

John F. Kirk; The Sohagi Law Group, Margaret M. Sohagi, Philip A. Seymour and Nicole H. Gordon for Plaintiffs and Appellants San Diego Association of Governments and San Diego Metropolitan Transit System.

Ronald W. Beals, Thomas C. Fellenz, David H. McCray, Brandon S. Walker and Elizabeth R. Strayer for State of California Department of Transportation as Amicus Curiae on behalf of Plaintiffs and Appellants.

Remy, Thomas, Moose & Manley, Sabrina V. Teller, Laura M. Harris; Brownstein Hyatt Farber Schreck, Beth Collins-Burgard and Dylan K. Johnson  for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Plaintiffs and Appellants.

Michael S. Lawson; Law Offices of Stuart M. Flashman, Stuart M. Flashman; Best Best & Krieger, Harriet A. Steiner and Kara K. Ueda for Hayward Area Planning Association and City of Hayward as Amici Curiae on behalf of Plaintiffs and Appellants.

Horvitz & Levy, Bradley S. Pauley, Jeremy B. Rosen, Mark A. Kressel; Gatzke Dillon & Ballance, Mark J. Dillon, Michael S. Haberkorn and Danielle K. Morone for Defendant and Respondent.

Heather Wallace, Erika Frank; and Robert Lapsley for The California Chamber of Commerce and The California Business Roundtable as Amici Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Christine M. Leone
Deputy City Attorney
1200 Third Avenue, Suite 1100
San Diego, CA 92101
(619) 236-6220

Philip A. Seymour
The Sohagi Law Group
11999 San Vicente Boulevard, Suite 150
Los Angeles, CA 90049-5136
(310) 475-5700

Jeremy B. Rosen
Horvitz & Levy
15760 Ventura Boulevard, 18th Floor
Encino, CA 91436-3000
(818) 995-0800