Filed 11/30/15 after remand

**CERTIFIED FOR PARTIAL PUBLICATION[*]**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CITY OF HAYWARD,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>BOARD OF TRUSTEES OF THE<br>CALIFORNIA STATE UNIVERSITY,<br><br>     Defendant and Appellant. | A131412, A132424<br><br>(Alameda County<br>Super. Ct. No. RG09480852) |
| HAYWARD PLANNING ASSOCIATION et al.,<br><br>     Plaintiffs and Respondents,<br><br>v.<br><br>BOARD OF TRUSTEES OF THE<br>CALIFORNIA STATE UNIVERSITY,<br><br>     Defendant and Appellant. | A131413, A132423<br><br>(Alameda County<br>Super. Ct. No. RG09481095) |

The Board of Trustees of the California State University (the Trustees) appeals a writ of mandate directing it to vacate its certification of an environmental impact report (EIR) prepared with respect to plans for the expansion of the California State University East Bay campus. The trial court agreed with plaintiffs and respondents City of Hayward and two local community groups, Hayward Area Planning Association and Old Highlands Homeowners Association, that the EIR failed to adequately analyze impacts on fire protection and public safety, traffic and parking, air quality, and parklands. In our

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of the final five paragraphs of section 3(b) of the Discussion, beginning on page 26 with the sentence "The trial court also found that there is no substantial evidence to support the determination that further mitigation is not feasible," and section 4 of the Discussion.

1

initial opinion, this court concluded that the EIR is adequate in all respects except that its analysis of potential environmental impacts to parkland is not supported by substantial evidence. The California Supreme Court granted review, and subsequently transferred the matter back to this court with directions to vacate our prior decision and reconsider the cause in light of the court's decision in *City of San Diego v. Board of Trustees of California State University* (2015) 61 Cal.4th 945 (*City of San Diego*). Having received and considered the parties' supplemental briefing, we reissue our opinion, modified in section 3(c) of the Discussion to reflect the holding of the Supreme Court in *City of San Diego*.

## Factual and Procedural History

The California State University East Bay (the University) is located within the City of Hayward (the city). The current physical capacity of the campus is 12,586 full-time equivalent students. The University's assigned enrollment ceiling, however, since 1963 has been 18,000 full-time equivalent students. In 2009, the Trustees approved a master plan to guide campus development for the next 20-30 years in order to expand the campus's physical capacity to meet its assigned enrollment ceiling.

The University's master plan has the following specific project objectives: (1) enhance the campus learning environment within a walkable campus core and accommodate growth in campus enrollment up to the longstanding master plan ceiling of 18,000 full-time equivalent students; (2) create supportive student neighborhoods and foster a sense of community, increase on-campus housing to accommodate 5,000 students and identify locations on campus for faculty housing; (3) implement design improvements, including improved campus entryway and pedestrian promenades; (4) implement comprehensive environmentally sustainable development and operation strategies; and (5) maintain the original master plan design criteria to preserve views while protecting users from the elements. To achieve these objectives, the master plan proposes to accommodate growth through in-fill development of new facilities and replacement of seismically deficient or functionally obsolete facilities. In total, this involves 1,039,000 square feet of new/replaced academic, administrative and support

space; 3,770 new student beds; and up to 220 faculty/staff housing units. These new and expanded facilities will be accommodated within the campus's existing land use configuration, consisting of an academic core surrounded by student residences and open space.

Having determined that an EIR was required to evaluate the potential significant environmental effects associated with the master plan, in April 2008 the Trustees' circulated a notice of preparation seeking input on the scope of the master plan EIR. In September 2008, the Trustees circulated a second notice of preparation notifying the public that the EIR would also include project-specific evaluation of two building projects. The first was the Pioneer Heights student housing project, which would provide an additional 600 beds in four buildings adjacent to existing dormitories. The second was the Harder Road parking structure project, which would replace an existing surface parking lot with a five-story parking structure.

Ultimately, the EIR studied aesthetics, air quality, biological resources, cultural resources, geology and soils, hazards and hazardous materials, hydrology and water quality, land use and planning, noise, population and housing, public services, traffic, circulation and parking, and utilities and service systems. The EIR analyzes three master plan project alternatives: reduced faculty/staff housing, reduced enrollment capacity, and no project; and two project-specific alternatives for the parking and student housing projects: reduced size and no project alternatives.

In March 2009, following issuance of a draft EIR and a public comment period, a final EIR was issued. The EIR concludes that the buildout under the master plan will result in significant impacts in four categories despite the implementation of all feasible mitigation measures: (1) aesthetics, (2) air quality, (3) cultural resources, and (4) traffic. All other impacts, including impacts on public services, were found to be insignificant or fully mitigated. The EIR concludes that the student housing project will not result in any significant environmental impacts. The EIR does find that the parking structure project will contribute to significant cumulative traffic impacts at three intersections, but that its other impacts are less than significant.

3

On September 23, 2009, the Trustees adopted a resolution certifying the EIR. The Trustees found that "impacts of the project have been mitigated to the extent feasible by the mitigation measures identified in the final EIR." For those impacts that could not be mitigated to a less than significant level, the Trustees adopted a statement of overriding considerations, concluding that all feasible mitigation measures will be implemented, and that the remaining significant unavoidable effects are outweighed and acceptable due to overriding economic, legal, social, technological, and other benefits, including increased access to higher education, increased employment opportunities for highly trained workers, an enhanced campus learning environment, and sustainable development.

On October 23, 2009, the city filed its petition for writ of mandate challenging the certification of the EIR and approval of the master plan. The local community groups filed their petition on October 26, 2009. By stipulation, the cases were coordinated for briefing and hearing. On October 28, 2010, the court issued an order granting petition for writ of mandate. On December 21, 2010, separate judgments were entered in the two cases. The Trustees filed timely notices of appeal. The cases were consolidated on appeal for briefing and decision.[1]

**Discussion**

1.  *Standard of Review*

The Trustees' compliance with the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) in the circumstances of this case is reviewed for an abuse of discretion. (Pub. Resources Code, § 21168.5.)[2] "An appellate court's review

_____

[1] Subsequently the trial court entered orders awarding attorney fees to respondents, which orders are the subject of separate appeals (Nos. A132423 and A132424). In view of the conclusions we reach on the merits of the principal appeal, we shall remand the appeals from the attorney fee awards for reconsideration. (See, e.g., *Environmental Protection Information Center v. Department of Forestry & Fire Protection* (2010) 190 Cal.App.4th 217.)

[2] Public Resources Code section 21168.5 provides: "In any action or proceeding, other than an action or proceeding under Section 21168, to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a

4

of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo. [Citations.] We therefore resolve the substantive CEQA issues . . . by independently determining whether the administrative record demonstrates any legal error by the [public agency] and whether it contains substantial evidence to support the [public agency's] factual determinations." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427.) We review de novo, or independently, the question whether the Trustees committed any legal error under CEQA (i.e., did not "proceed[] in a manner required by law") in preparing and certifying the EIR and approving the master plan. (Pub. Resources Code, § 21168.5.) When a public agency does not comply with procedures required by law, its decision must be set aside as presumptively prejudicial. (*Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1236.) Noncompliance by a public agency with CEQA's substantive requirements or noncompliance with its information disclosure provisions that preclude relevant information from being presented to the public agency "constitute[s] a prejudicial abuse of discretion within the meaning of Sections 21168 and 21168.5 [of the Public Resources Code], regardless of whether a different outcome would have resulted if the public agency had complied with those provisions." (Pub. Resources Code, § 1005, subd. (a); *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 946.) "In other words, when an agency fails to proceed as required by CEQA, harmless error analysis is inapplicable. The failure to comply with the law subverts the purposes of CEQA if it omits material necessary to informed decisionmaking and informed public participation." (*County of Amador*, at p. 946.) We apply the substantial evidence standard of review to a public agency's "conclusions, findings, and determinations, and to challenges to the scope of an EIR's analysis of a topic, the

prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence."

5

methodology used for studying an impact, and the reliability or accuracy of the data upon which the EIR relied because these types of challenges involve factual questions." (*City of Long Beach v. Los Angeles Unified School Dist*. (2009) 176 Cal.App.4th 889, 898.) "Substantial evidence" is defined as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (CEQA guidelines, § 15384, subd. (a).)[3] "The agency is the finder of fact and we must indulge all reasonable inferences from the evidence that would support the agency's determinations and resolve all conflicts in the evidence in favor of the agency's decision." (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 117.) However, "[a]rgument, speculation, unsubstantiated opinion or narrative, evidence which is clearly inaccurate or erroneous . . . is not substantial evidence. Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts." (Pub. Resources Code, § 21082.2, subd. (c).)

2.      *Fire and Emergency Medical Services*

The EIR concludes that the increase in campus population will not result in a significant environmental impact in the category of fire and emergency medical services, which are provided by the Hayward Fire Department (HFD). The EIR explains, "Based on a service ratio of one staff person for 1,000 people, the additional daily population, including increases in [full time equivalent students], faculty, and staff, associated with the proposed Master Plan would result in a need for 11 additional firefighters. Given that there are 10 firefighters in each company, this equates to one additional fire company. Additional fire station facilities would be needed to house the staff required to serve the project's population. This would be achieved by adding another bay with an additional engine company, or by constructing an additional fire station. Construction associated

---

[3]  The term "CEQA guidelines" refers to the regulations codified in title 14, section 15000 et seq. of the California Code of Regulations, which have been "prescribed by the Secretary of Resources to be followed by all state and local agencies in California in the implementation of [CEQA]." (CEQA Guidelines, § 15000.)

with expanding or adding additional fire station facilities within the [city] would be subject to environmental review under CEQA. However, expansion or construction of a fire station would not result in significant environmental impacts due to the limited area that is typically required to build a fire station (between 0.5 and 1 acre) and its urban location. Therefore, the impact related to the provision of fire services to the campus would be less than significant." Based on this analysis the EIR concludes that no mitigation is required.[4]

In reaching this conclusion, the EIR applies the standard for significance set forth in appendix G, part XIV, of the CEQA guidelines,[5] which advises the agency to ask, "Would the project result in substantial adverse physical impacts associated with the provision of new or physically altered governmental facilities . . . the construction of which would cause significant environmental impacts, in order to maintain acceptable service ratios, response times or other performance objectives . . . ?"

Throughout the EIR process, the city argued that the standard of significance adopted by the Trustees was not sufficient. In its comments to the draft EIR, the city explained, "The University should have first analyzed the significance of the fire and emergency service impact and concluded that the impact on response times was a significant adverse impact on health and safety problems . . . , as evidenced by the need for 11 new firefighters to respond to the increased population while generally retaining

---

[4] The public safety section of the EIR also addresses additional concerns raised by HFD regarding "the density of proposed student housing, mixed-use construction with limited vehicular access within the context of campus topography, the provision of life-safety infrastructure (e.g., sprinkler systems, alarm systems, emergency generators), fire flow specifications, and hazardous materials" and concludes that "[a]lthough none of these concerns relate to the CEQA standard of significance, which is whether project implementation would require the construction of a new fire station or expansion of an existing fire station, the Campus has considered these comments . . . where relevant." The EIR includes assurances that the University will comply with all applicable fire safety regulations. Compliance with fire safety regulations is not an issue raised on appeal.

[5] Appendix G provides a checklist for use by lead agencies in determining whether a proposed project would have a significant effect on the environment.

7

the same or similar response times and service levels. It would be a significant impact because, at present, neither the 11 firefighters nor the facilities for them exist. Then, the University should have examined the possible mitigation measure(s) that could ameliorate this impact and determined that as least two things would be needed to mitigate this impact: (1) the hiring of 11 additional firefighters; and (2) facilities and equipment for these firefighters. Since the city provides the University with fire protection services, the facilities would likely be built on land outside of the University's jurisdiction. The mitigation for this impact would be a commitment of the University to provide necessary funding for the firefighters and the facilities."

The trial court agreed with the city, finding that the analysis in the EIR was inadequate in two respects. First, the court found that there was no substantial evidence to support the conclusion in the EIR that the construction of additional fire department facilities would not have a significant impact on the environment. Second, the court found that the EIR failed to fully analyze the potential impact of the master plan on the provision of fire and emergency response services. The trial court explained, "It is not that there is an increased demand for fire protection services that must per se be evaluated as an environmental impact. Rather it is the lack of adequate fire protection services consequent to the construction of the physical project that must be evaluated in the EIR as a significant effect of the project. The project will cause fire protection services, measured from the existing baseline, to change from adequate to inadequate. That condition of inadequate fire protection services causes an adverse effect on people and property, i.e., both people and property will not be safe in the event of a fire. It follows directly that the lack of adequate fire protection service must be regarded as a significant effect. [Citations.] Such a significant effect must be mitigated, if feasible."

We disagree with the trial court's first finding. The record supports the conclusion in the EIR that additional or expanded fire facilities will not have a significant environmental impact. The EIR acknowledges that construction of a new or expanded fire station will require compliance with CEQA, but concludes that there will be no significant impact based on its urban location and relatively small size. In its comments

8

to the draft EIR, the city argued that it is "improper for the DEIR to first state that an expansion or an additional fire station would require environmental review and then to immediately thereafter conclude that such a project would not result in an environmental impact. The University is not permitted to prejudge the future environmental impacts of a project that is not even in the pre-planning stages. Neither the University nor the city know whether either an expansion or addition would be needed and what that future expansion or addition would entail, much less where it would be located or when it would be considered. . . ." The EIR offers the following response: "Regarding the commenter's concern that the environmental impacts of a new or expanded fire station cannot be known at this time in the absence of a known site for such a facility, the Master Plan EIR explains why it concluded that the physical environmental impacts from the construction of such a facility would likely be less than significant. A new fire station would of necessity be located within the city limits of Hayward and since most of the city is highly developed, the site of a fire station would likely be an infill vacant lot. Even if it were to be located in a less intensely developed portion of the city such as parts of Hayward hills, the development of a fire station would disturb between 0.5 and 1 acre of land. The development at the scale (a two-story high fire station on less than 1 acre of land) is unlikely to result in significant unavoidable environmental impacts. Given the nature of the project (fire station) and its size, environmental documents for fire station construction or expansion are typically categorical exemptions or negative declarations (Note that some lead agencies have determined that fire station expansions qualify for a categorical exemption under section 15301 of the CEQA guidelines)." This explanation is reasonable and sufficient. Given the unknown size and precise location of the future facilities and the absence of control by the Trustees over the future decision-making process, no more detailed analysis is possible at this time. But in view of the known size requirements of a fire station and the general area within which the additional facilities necessarily will be placed, the determination that the new facilities will not result in a significant environmental impact is supported by substantial evidence.

We also reject the trial court's conclusion that CEQA requires the Trustees to provide mitigation to address the need for additional fire protection services. Respondents argue that the population increase will cause dangerously long response times and that the Trustees are required to fund the construction and staffing of an additional fire station to mitigate this significant impact. They assert, "Delayed response times have real impacts on both people and physical facilities. A delay in response could literally mean the difference between life and death, decrease the risk of survival, increase the severity and degree of a person's burns, or increase the total number and type of injuries. . . . A delay in response also affects the spread of fire, the growth of which is exponential." While this may be true, the obligation to provide adequate fire and emergency medical services is the responsibility of the city. (Cal. Const., art. XIII, § 35, subd. (a)(2) ["The protection of the public safety is the first responsibility of local government and local officials have an obligation to give priority to the provision of adequate public safety services."].) The need for additional fire protection services is not an *environmental* impact that CEQA requires a project proponent to mitigate. Section 15382 of the CEQA guidelines defines "significant effect on the environment" as "a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance. An economic or social change by itself shall not be considered a significant effect on the environment. A social or economic change related to a physical change may be considered in determining whether the physical change is significant."

*Goleta Union School Dist. v. Regents of University of California* (1995) 37 Cal.App.4th 1025 is instructive. In that case, the court evaluated the potential impact of increased university population on local public schools, which is also included as a public service under appendix G. In that case, the EIR estimated that the anticipated population increase would result in a shortage of approximately 172 seats at the local elementary school. The EIR described several options the school district might choose to accommodate the shortfall, including redistributing students to other facilities, beginning

year-round schools, increasing the use of portable classrooms and building permanent new classroom facilities. (*Id*. at pp. 1028-1029.) While the university offered to contribute a fair share to the cost of mitigating any physical environmental impacts associated with these options, the school district sought guaranteed funding for building a new school, arguing that the overcrowding itself was an environmental impact for which mitigation was required. (*Id*. at p. 1029.) Relying on section 15382, the court rejected the school district's argument that "classroom overcrowding, per se, . . . constitute[s] a significant effect on the environment under CEQA." (*Id*. at p. 1032.) The court explained, "in some cases socio-economic effects may cause physical changes that significantly affect the environment. An example might be a five-fold increase in student enrollment. Such a large increase would likely necessitate the construction of additional classrooms. That is not the case here. . . . [Citations.] [¶] The SEIR [supplemental EIR] was required here only because the trial court believed the project would ultimately require physical changes in the environment such as construction of new school facilities, new bus schedules and changed traffic patterns." (*Ibid*.) Ultimately, the court concluded that "[b]ecause the projected increases in student enrollment here do not in themselves constitute a significant physical impact on the environment, no findings were required in the SEIR to show that the plan alleviates increased enrollment." (*Id*. at p. 1033.) Likewise, in the present case the Trustees satisfied their obligations under CEQA by evaluating whether the additional fire protection services that must be provided by the city will result in any significant environmental impacts. Having concluded based on substantial evidence that the increased fire personnel and housing would not cause a significant environmental impact, no mitigation measures were required.

Contrary to respondents' argument, *City of Marina v. Board of Trustees of California State University* (2006) 39 Cal.4th 341 does not provide authority for requiring the Trustees to pay for an additional fire station and the salaries of additional fire fighters. In that case, the EIR found that the expansion of the California State University's Monterey Bay campus would have "significant effects on the physical environment," explaining with respect to fire protection that " '[c]ampus population and

11

facility growth will result in increased demand for fire protection services.' " (*Id*. at p. 350.) [6] Having found that the project would cause significant environmental impacts outside its campus, the Trustees nonetheless refused to fund as mitigation "improvements to fire protection services" in surrounding areas in part on the ground that the Trustees may not legally contribute funds toward these improvements. (*Id*. at pp. 352-353.) The California Supreme Court rejected this argument, finding that a voluntary payment for infrastructure improvements made in mitigation of off-campus environmental effects of the expansion of the campus is not prohibited by law. (*Id*. at pp. 356-357.) The court explained that it is the responsibility of the Trustees to "determine the amount of any voluntary contribution [they] may choose to make as a way of satisfying their obligation under CEQA to mitigate the environmental effects of their project," subject to review for an abuse of discretion, and that nothing obliged the Trustees to pay more than is necessary to mitigate its environmental effects. (*Id*. at pp. 361-362.) The opinion addresses only the ability of the Trustees to make voluntary payments as part of its obligation to mitigate impacts it has identified as significant. The Supreme Court analysis accepts the premise from the EIR that the proposed project would result in significant environmental impacts requiring mitigation measures and addresses only whether there is a legal prohibition on the Trustees' ability to make a voluntary payment in satisfaction of its mitigation obligations. In contrast, the EIR in the present case determines, based on substantial evidence, that implementation of the master plan will not result in a significant impact in this respect. Therefore *City of Marina* provides no

---

[6] There is no discussion in *City of Marina* regarding the standard of significance applied by the Trustees to reach the conclusion that the master plan would cause substantial environmental impacts in the area of public services. However, the campus in that case was being developed on an old military base with limited existing public services. In contrast, the campus being expanded in the present case is surrounded by a functioning municipality with significant public services. In all events, the analysis in *City of Marina* proceeds on the premise that the expansion would have a significant environmental impact, whereas in the present case the finding, supported by substantial evidence, is to the contrary.

12

authority for the contention that the Trustees must fund the expansion of fire department services that the campus expansion will require.

Relying on *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, respondents argue that delayed response times must be evaluated as a "health and safety problem" under section 15126.2 of the CEQA guidelines.[7]  In *Bakersfield Citizens for Local Control v. City of Bakersfield* , *supra,* 124 Cal.App.4th at page 1219, the EIR concluded that construction and operation of a shopping center would cause significant unavoidable direct adverse impacts to regional air quality.  The court found that the EIR was inadequate because it "failed to correlate the identified adverse air quality impacts to resultant adverse health effects."  (*Ibid*.)  The court explained, "Guidelines section 15126.2, subdivision (a) requires an EIR to discuss, inter alia, 'health and safety problems caused by the physical changes' that the proposed project will precipitate.  Both of the EIRs concluded that the projects would have significant and unavoidable adverse impacts on air quality.  It is well known that air pollution adversely affects human respiratory health.  [Citation.]  Emergency rooms crowded with wheezing sufferers are sad but common sights in the San Joaquin Valley and elsewhere.  Air quality indexes are published daily in local newspapers, schools monitor air quality and restrict outdoor play when it is especially poor and the public is warned to limit their activities on days when air quality is particularly bad.  Yet, neither EIR acknowledges the health

---

[7]  CEQA guideline  section15126.2, subdivision (a) provides:  "An EIR shall identify and focus on the significant environmental effects of the proposed project. In assessing the impact of a proposed project on the environment, the lead agency should normally limit its examination to changes in the existing physical conditions in the affected area as they exist at the time the notice of preparation is published . . . .  Direct and indirect significant effects of the project on the environment shall be clearly identified and described, giving due consideration to both the short-term and long-term effects.  The discussion should include relevant specifics of the area, the resources involved, physical changes, alterations to ecological systems, and changes induced in population distribution, population concentration, the human use of the land (including commercial and residential development), health and safety problems caused by the physical changes, and other aspects of the resource base such as water, historical resources, scenic quality, and public services."

consequences that necessarily result from the identified adverse air quality impacts. Buried in the description of some of the various substances that make up the soup known as 'air pollution' are brief references to respiratory illnesses. However, there is no acknowledgement or analysis of the well-known connection between reduction in air quality and increases in specific respiratory conditions and illnesses. After reading the EIR's, the public would have no idea of the health consequences that result when more pollutants are added to a nonattainment basin. On remand, the health impacts resulting from the adverse air quality impacts must be identified and analyzed in the new EIR's." (*Id.* at pp. 1219-1220.)

In the present case the EIR does analyze response times and their impact on public safety. The EIR concludes that the project will cause response times to fall to an inadequate service level and finds that 11 additional fire fighters will be required to maintain adequate service levels. The EIR also sets forth the measures needed to provide adequate emergency services and concludes, as discussed above, that those measures will not have a significant impact on the environment. A concerned citizen reading the EIR in this case would understand the impacts of the proposed increase in population on emergency services in the area. Nothing in *Bakersfield Citizens for Local Control* implies that the delayed response times are an impact that must be mitigated by the project sponsor, here the Trustees.

*Christward Ministry v. Superior Court* (1986) 184 Cal.App.3d 180, also cited by respondents, demonstrates this point. In that case the court found that an EIR was required to evaluate the potential environmental impacts of a waste management facility on nearby property used as a religious retreat. The court explained, "The guidelines . . . state '[e]conomic or social effects of a project may be used to determine the significance of physical changes caused by the project.' [Citation.] The following example is given: '[I]f the construction of a road and the resulting increase in noise in an area disturbed existing religious practices in the area, the disturbance of the religious practices could be used to determine that the construction and use of the road and the resulting noise would be significant effects on the environment. The religious practices would need to be

14

analyzed only to the extent to show that the increase in traffic and noise would conflict with the religious practices.' [Citation.] Christward presented evidence that the presence of solid waste facilities would disturb its religious practices, worship in the natural environment of the Cresthaven Retreat." (*Id.* at p. 197, citing § 15131, subd. (b).) Applying this analysis in the present case, delayed response times, like interference with religious practices, may be a factor in determining whether the increased population concentration is significant. Under section 15131, subdivision (a), however, "The intermediate economic or social changes need not be analyzed in any detail greater than necessary to trace the chain of cause and effect. The focus of the analysis shall be on the physical changes." The EIR in this case properly notes the effect of population increases on service levels but concludes that the impact is not significant because services can be maintained at an adequate level with the increase in personnel and expansion of facilities that will not adversely affect the environment.

The potential dangers associated with delayed response times do not mandate a finding of significance under section 15065, subdivision (a)(4) of the Guidelines, which provides: "A lead agency shall find that a project may have a significant effect on the environment and thereby require an EIR to be prepared for the project where there is substantial evidence, in light of the whole record, that any of the following conditions may occur: [¶] . . . [¶] (4) The environmental effects of a project will cause substantial adverse effects on human beings, either directly or indirectly." Based on the analysis discussed above, there is no basis to conclude that the increased population will cause a "substantial adverse effect on human beings." Although there is undoubtedly a cost involved in the provision of additional emergency services, there is no authority upholding the city's view that CEQA shifts financial responsibility for the provision of adequate fire and emergency response services to the project sponsor. The city has a constitutional obligation to provide adequate fire protection services. Assuming the city continues to perform its obligations, there is no basis to conclude that the project will cause a substantial adverse effect on human beings.

Finally, we find no deficiency in the EIR's analysis of cumulative impacts on public services. The EIR bases its analysis of cumulative impacts on the evaluation of cumulative impacts made in connection with the adoption of the city's general plan, "adding the impacts from the campus growth to those projected for the rest of the city." The EIR for the city's general plan found no cumulative impact from city growth on fire services and the master plan EIR finds no significant effect on fire services, for which reason the EIR concludes that "the cumulative effect would be less than significant." If the city's finding was in fact based on a "planning assumption that necessary mitigation would be paid by developers making their fair share contributions for mitigations related to their projects," as the trial court observed, the fact remains that the city does not anticipate any significant impact on fire services from its growth and the EIR finds that there will be no significant environmental impact as a result of increased fire services necessitated by campus growth. Accordingly, the EIR reasonably concludes that any cumulative impact of the growth will be less than significant in this respect. (See *Santa Monica Chamber of Commerce v. City of Santa Monica* (2002) 101 Cal.App.4th 786, 799 ["Just as zero when added to any other sum results in no change to the final amount, so, too, when no environmental impacts cognizable under CEQA are added to the alleged environmental impacts of past projects, there is no cumulative increased impact."].)

Thus, we conclude that the EIR adequately analyzes the impact of the project on fire and emergency services and the writ of mandate must be modified to the extent it requires any further analysis of this subject.

3.    *Traffic Impacts*

a.    <u>Faculty Housing – Grandview Alternative</u>

The master plan notes that due to the high cost of housing, particularly in California, "university and college campuses are exploring and in some cases implementing housing projects targeted to faculty and staff." The plan acknowledges that the cost of constructing and managing faculty housing can make such projects infeasible and explains that "[a]t this time there is no specific program for housing

16

planned, but as the demand for this type of housing is better understood, further study will evaluate the suitability and timing of possible development." Expressing a desire to "begin to explore housing options," however, the plan identifies three potential locations that may be suitable for future construction of affordable faculty housing. One of the locations "lies on the south of the developed portion of campus, just east and above the . . . student housing area. This site would be accessed most easily from Grandview Avenue and possibly from the student housing area."

The EIR concludes that the construction of faculty housing at this alternative location will not have a significant environmental impact as a result of increased parking or traffic. The EIR explains, "If this site is eventually selected for housing development, it will be determined at that time whether access to the housing would be provided via the campus streets that serve the Pioneer Heights student housing complex or via Civic Avenue, Cotati Road, and Grandview Avenue. Conservatively, it was assumed for the purposes of this traffic analysis that residents of the faculty and staff housing would use the Civic Avenue route to access their homes. Trips added by the development of this housing to the intersection of Hayward Boulevard and Civic Avenue were evaluated for their effect on intersection operations. The number of trips that would be added during the AM and PM peak hour would not affect the operation of this signalized intersection. The impact would therefore be less than significant." The Trustees have made clear that "[i]n the event that at some future date the University does consider development of this site, additional project-level studies and CEQA review will be conducted, which would require a more detailed analysis of the effect of project traffic on the narrow residential streets in the Grandview neighborhood, and would also require an evaluation as to the feasibility of providing access to this site from the roadway serving the [student housing] area. Any impacts deemed significant would be identified and the appropriate mitigation required as part of the detailed analysis."

Respondents objected to this analysis, arguing that the EIR should have evaluated potential impacts to additional roads in the immediate neighborhood. The trial court agreed, finding that the EIR improperly deferred analysis of traffic impacts caused by

17

potential faculty housing on surrounding small residential streets.  For the reasons discussed below, we conclude that the analysis of potential sites for faculty housing was sufficient for a program EIR.

"A program EIR . . . is 'an EIR which may be prepared on a series of actions that can be characterized as one large project' and are related in specified ways.  [Citation.]  An advantage of using a program EIR is that it can '[a]llow the lead agency to consider broad policy alternatives and program wide mitigation measures at an early time when the agency has greater flexibility to deal with basic problems or cumulative impacts.'  [Citation.]  Accordingly, a program EIR is distinct from a project EIR, which is prepared for a specific *project* and must examine in detail site-specific considerations.  [Citation.]  [¶] Program EIR's are commonly used in conjunction with the process of tiering.  [Citation.]  Tiering is 'the coverage of general matters in broader EIRs (such as on general plans or policy statements) with subsequent narrower EIRs. . . .'  [Citation.]  Tiering is proper 'when it helps a public agency to focus upon the issues ripe for decision at each level of environmental review and in order to exclude duplicative analysis of environmental effects examined in previous environmental impact reports.'  [Citations.]  [¶] In addressing the appropriate amount of detail required at different stages in the tiering process, the CEQA Guidelines state that '[w]here a lead agency is using the tiering process in connection with an EIR for a large-scale planning approval, such as a general plan or component thereof . . . , the development of detailed, site-specific information may not be feasible but can be deferred, in many instances, until such time as the lead agency prepares a future environmental document in connection with a project of a more limited geographic scale, as long as deferral does not prevent adequate identification of significant effects of the planning approval at hand.'  [Citation.]  This court has explained that '[t]iering is properly used to defer analysis of environmental impacts and mitigation measures to later phases when the impacts or mitigation measures are not determined by the first-tier approval decision but are specific to the later phases.' "  (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1169-1170.)

Here, the Trustees created a program EIR for approval of the University's master plan and utilized a tiering approach for analysis of future projects not yet in development.[8] One of the primary concerns evaluated in the EIR is the impact of increased population on traffic in the surrounding areas. Consistent with this concern, the EIR evaluates the potential impacts of locating faculty housing near Grandview Avenue on the primary intersections in that area. This analysis is important to avoid piecemeal consideration of cumulative traffic impacts. Site-specific impacts to the smaller residential streets in the neighborhood and related mitigation measures, however, were properly deferred until the project is planned and a project EIR is prepared. Although locating housing at this site may cause impacts to the neighborhood, there are many variables to be considered in connection with such a project, such as the location of entrances and placement of parking spaces, that will affect where in the surrounding neighborhood the impacts will be most felt and the measures that can mitigate those impacts. These specifics cannot meaningfully be evaluated at this point. There is no suggestion that deferring consideration of site specific impacts will disguise cumulative impacts or preclude proper consideration of mitigation measures if and when construction of such housing is proposed.

In *Rio Vista Farm Bureau Center v. County of Solano* (1992) 5 Cal.App.4th 351, the court rejected a similar claim that an EIR improperly deferred consideration of the environmental impacts of a project authorized under the general plan but not currently slated for development. Like the master plan in this case, the general plan in that case recognized the potential need for additional hazardous waste disposal facilities, but did not select a specific site for the facilities. Instead, the plan designated certain areas within the county as being potentially consistent with stated criteria for such a facility. (*Id*. at p. 364.) The court explained that "the Plan makes no commitment to future facilities other than furnishing siting criteria and designating generally acceptable locations. While

---

[8] This is in contrast to the two project EIRs created for the student housing facility and the parking structure, which are currently proposed for development.

19

the Plan suggests that new facilities may be needed by the County, no siting decisions are made; the Plan does not even determine that future facilities will ever be built. Both the Plan and the [final EIR] consistently state that no actual future sites have been recommended or proposed. For that reason, the [final EIR] is intended to be a 'program EIR' or 'tiering EIR,' with subsequent 'project EIR's' to follow in the event specific, identified facilities are proposed in the future." (*Id*. at p. 371, fn. omitted.) The court concluded that "[c]onsidering the speculative nature of any secondary effects from an uncertain future facility, which will be subject to its own separate environmental review, . . . no further findings on environmental impacts or the rationale for such findings was reasonably required from the [final EIR]." (*Id*. at p. 375.)

*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova, supra,* 40 Cal.4th 412, cited by respondents, is distinguishable. In that case, the court held that an EIR for a large housing and commercial development project could not defer or "tier" analysis to a future programmatic EIR for a local agency's master plan update. (*Id*. at pp. 440-441.) The level of analysis required in the project EIR in that case is not comparable to the broad plans and policies included in the program EIR at issue in this case. (See *In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1171 & fn. 10 [distinguishing *Vineyard Area Citizens for Responsible Growth, Inc.* on ground that final EIR for a site-specific project to develop a 6,000-acre, 22,000-residential-unit master planned community is not comparable to an EIR for "broad, general, multi-objective, policy-setting, geographically dispersed" program].) Here, the Trustees properly evaluated potential cumulative impacts on traffic at the proposed location and deferred site-specific analysis until the faculty housing project is under development.

      b.    <u>Increased Parking and Traffic</u>

The master plan anticipates that a significant increase in traffic and parking demand will accompany the increase in campus population. The plan notes that if current parking demands were applied to the increased population, the campus would need almost twice the existing number of parking spots. This in turn would cause significant traffic congestion on and off campus. The plan acknowledges that "[t]o evolve into a

more sustainable campus, the University must move away from the current reliance on driving as the primary mode of access for commuters." The plan recognizes, however, that "[o]ne of the major constraints faced by the Hayward campus is the lack of convenient access to the campus" because the campus is located two miles from downtown Hayward, on steep hillside, bordered on two sides by residential neighborhoods consisting primarily of single-family homes and on the other sides by open space and state-owned land. In view of these obstacles, the plan details a range of sustainable transit policies that can be utilized to reduce single-occupancy vehicle use as part of a "Transportation Demand Management (TDM) program." The TDM sets minimum performance goals of reducing the percentage of single driver vehicle trips onto campus from the existing 79 percent to 64 percent, and increasing present transit use by 50 percent. The EIR designates the TDM program as mitigation for the significant impacts caused by increased parking and traffic.

The TDM program included in the master plan and incorporated in the EIR provides as follows:

"*Improved Transit Service*

- Enhanced AC Transit Route 92 to the Downtown Hayward BART station, ensuring frequent headways from 6 AM to 11 PM that are coordinated with BART arrival times to meet passenger demand, provided free to University staff, faculty and students.

*"Alternative Mode Use Incentives*

- Discounted or free AC Transit passes for all students, faculty and staff.

- Discounted BART tickets for students, faculty and staff through the Commuter Check program or a similar program; or a 'Clean Air Cash' program where those choosing to commute by BART receive a cash payment and are not allowed to purchase a normal parking permit.

- Carpool matching service and vanpool program.

- Preferential parking for carpools and vanpools.

- Continued participation in the Alameda County Congestion Management Agency's Guaranteed Ride Home program for alternative mode users.

21

- Provision of a flexible car rental service program (carsharing) on campus to provide access to vehicles for those who choose not to commute to campus by car or residents who do not maintain a car on campus.

- Provision for participation in alternative mode programs to purchase a certain number of single-day parking permits to allow for commute flexibility and promote alternative mode use for those who may occasionally need to use a car.

"*Parking Management*

- Provide a scaled parking permit pricing structure that ties the cost of parking to the level of use and location, and that provides funding needed to maintain and operate the parking system, including provision of the new parking lots/structures.  In planning for future permit price changes, aim to increase parking costs to a level even with the costs of commuting by bus or BART to the campus to the extent feasible within the context of CSU collective bargaining agreements and equity for students.

- Manage the campus parking supply to achieve a peak occupancy level of 85%, to avoid over-supply when new lots/structures are provided and undersupply when new buildings are constructed pm sites identified in the Hayward Campus Master Plan."

The EIR designates as mitigation measure "TRANS 1a" the requirement that the University prepare a comprehensive TDM Implementation Plan that includes steps necessary to plan for, fund, implement, and monitor the effectiveness of the measures outlined in the Master Plan TDM section."  Mitigation measure "TRANS 1b" requires the University to "conduct periodic traffic counts at the primary gateways . . . to monitor the effectiveness of new TDM programs as they are implemented."  The EIR provides further, "As part of its TDM Implementation Plan for the Hayward campus, the University will undertake an alternative transportation and parking study to fully evaluate the cost and projected effectiveness of the strategies listed by the city along with others identified in the Hayward Campus Master Plan.  The study will identify alternative combinations of strategies, recommend a preferred combination, and identify specific targets for trip reduction, transit ridership, carpooling, parking provision and parking permit pricing at regular intervals, scaled to projected enrollment growth and campus building plans.  The TDM Implementation Plan will include a monitoring program at

three-year intervals tied to the phasing of capital construction and enrollment growth. The monitoring program will include detailed counts at all entrances, to assess the relationship between automobile use, other modes of access and enrollment growth. A critical aspect of this monitoring program will be to ascertain the elasticity of demand for transit in relation to students' and employees' travel patterns, the level of transit service available, cost of automobile use, and parking management. The TDM Implementation Plan will also consider how the provisions of additional housing, food service and convenience services on campus will reduce the need for off-campus trips, particularly at peak hours. This study implementation plan will be completed within two years of the adoption of the Master Plan. Based on the TDM Implementation Plan, the University will review its congestion management analysis and revise as warranted. The University will provide an annual report to the city regarding progress on the implementation of the TDM Plan as well as the results of the monitoring, the strategies being implemented, and the effectiveness of the strategies in reducing vehicular traffic."

The EIR concludes that while implementation of these mitigation measures will reduce the level of significance, the traffic and parking impacts will remain significant and unavoidable. Accordingly, the Trustees adopted a statement of overriding considerations with respect to the remaining significant and unavoidable impacts.

The trial court found that "[t]he TDM program described in the EIR does not mitigate the significant traffic impacts that were identified. Instead, the EIR improperly defers decisions about mitigation in a manner that does not satisfy the requirements of CEQA." The Trustees contend the TDM program is specific and enforceable and in full compliance with CEQA.

CEQA requires that feasible mitigation measures for significant environmental effects must be set forth in an EIR for consideration by the lead agency's decision makers and the public before certification of the EIR and approval of a project. While generally the formulation of mitigation measures cannot be deferred until after certification of the EIR and approval of a project, "[d]eferral of the specifics of mitigation is permissible where the local entity commits itself to mitigation and lists the alternatives to be

23

considered, analyzed and possibly incorporated in the mitigation plan.  [Citation.]  On the other hand, an agency goes too far when it simply requires a project applicant to obtain a biological [or other] report and then comply with any recommendations that may be made in the report." (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1275.)  "If mitigation is feasible but impractical at the time of a general plan or zoning amendment, it is sufficient to articulate specific performance criteria and make further approvals contingent on finding a way to meet them." (*Endangered Habitats League, Inc. v. County of Orange* (2005) 131 Cal.App.4th 777, 793.)

The master plan recognizes that "[e]fforts to shift commuters out of single-occupant cars and into carpools, vanpools, transit and bicycling/walking are most successful when all of the following strategies are implemented:  Meaningful financial incentives to use alternative travel modes are provided; Alternative modes are convenient and comprehensive; Flexibility of use is provided for."  The TDM Plan identifies a number of alternative policies consistent with the above strategies that may be utilized to mitigate traffic growth.  The traffic experts relied on in the EIR to evaluate the TDM program estimated that by implementing the various policies, it would be possible to increase transit ridership by 50 percent, double carpool usage (with an increase to three people per carpool, so that carpools account for 10 percent of all automobile users), reduce residential parking by half, and reduce commuter parking in proportion to the reduction in vehicle trips.

The Trustees have committed to perform the feasible mitigation measures included in the TDM.  As summarized in the EIR in response to a letter from the city, "The University has established a goal to reduce the percentage of drive-alone vehicle trips from the existing 79 percent to 64 percent in the Master Plan and has also under this Master Plan committed to implementing a comprehensive TDM plan to help attain this goal.  Once the Master Plan is adopted, the University will be required to develop and implement that TDM plan.  In other words, the TDM plan is part of the proposed project.  As stated in the Draft EIR, Mitigation Measure TRAN-1a is included in the EIR solely to further ensure that the TDM plan is developed and implemented.  As explained in Master

24

Response 1, the University has committed to completing an evaluation of various TDM measures and adopting a TDM plan within 2 years of the approval of the Master Plan. This commitment is included in the revised Mitigation Measure TRANS-1 and the MMRP that will be adopted at the time of project approval. The Master Plan goal to reduce drive alone vehicle trips is the performance standard that the TDM plan will strive to meet. The EIR . . . provides details about the types of programs that the University will evaluate and adopt to achieve this goal. Because the Master Plan covers a long range development program and is based on projections of growth that may or may not occur, it is necessary that the University retain the flexibility to select those programs that best work at a given point in time." The CEQA notice of determination states that mitigation measures were made a condition of approval of the project and the statement of overriding consideration indicates that it is adopted with respect to the remaining unavoidable significant impacts.

While the Trustees have not committed to implementation of any particular measure that is specified in the TDM plan, the TDM is not illusory. The plan enumerates specific measures to be evaluated, it incorporates quantitative criteria and it sets specific deadlines for completion of the parking and traffic study and timelines for reporting to the city on the implementation and effectiveness of the measures that will be studied. The monitoring program which is an integral part of the plan ensures that the public will have access to the information necessary to evaluate compliance with the Trustees' obligations.

The approach taken by the Trustees is consistent with the approach taken in numerous cases with judicial approval. (E.g., *Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1028-1029 (*SOCA*) [city "has set forth a list of alternatives to be considered in the formulation of a transportation management plan . . . [¶] . . . where practical considerations prohibit devising such measures early in the planning process (e.g., at the general plan amendment or rezone stage), the agency can commit itself to eventually devising measures that will satisfy specific performance criteria articulated at the time of project approval"]; *California Native Plant Society v. City of*

25

*Rancho Cordova* (2009) 172 Cal.App.4th 603, 621 (*CNPS*) [*"SOCA* stands for the proposition that when a public agency has evaluated the potentially significant impacts of a project and has identified measures that will mitigate those impacts, the agency does not have to commit to any particular mitigation measure in the EIR, so long as it commits to mitigating the significant impacts of the project"]; *Defend the Bay v. City of Irvine, supra,* 119 Cal.App.4th at p. 1275 ["Deferral of the specifics of mitigation is permissible where the local entity commits itself to mitigation and lists the alternatives to be considered, analyzed and possibly incorporated in the mitigation plan"].)  Accordingly, we conclude that the EIR does not improperly defer mitigation of the traffic impacts.

The trial court also found that there is no substantial evidence to support the determination that further mitigation is not feasible.  The court explained, "There is no evidence in the record to support [the Trustees'] premise that the best case scenario for mitigation of parking and traffic effects is a 50% increase in transit use.  Thus [the Trustees'] conclusion that neither [their] proposed 'mitigation' measures, nor the alternatives proposed by [respondents], could mitigate the effects of the project to a level of insignificance is completely without foundation."   However, with one exception, no means of further increasing the use of public transit or reducing traffic congestion were suggested that were not incorporated in the TDM program.[9]  The single exception is a "Real Transit" proposal submitted by the Hayward Area Planning Association which respondents contend would more effectively increase public transit use.

Initially, we note that a number of the transit policies included in the Real Transit plan were considered and adopted as part of the final TDM Program.  The following features are included in both the Real Transit proposal and the TDM program included in the final EIR: transit model using student zip codes based on Alameda County

---

[9]  The Trustees take exception to respondents' characterization of "the TDM Plan's targeted transit and parking performance standards as 'ceilings.' "  They suggest that the standards, including a 50 percent increase in transit ridership, are "minimum standards" and that the TDM includes options to reduce future parking supply should transit ridership increases exceed expectations.

26

Congestion Management Agency data; free or discounted transit passes; bus service timed with student classes; and reorganized campus bus stops. The primary difference between the TDM program and the Real Transit proposal, as emphasized by respondents, is the type of bus used to shuttle passengers from the local BART station to campus. The TDM program relies on maximizing the efficiency of existing local bus service, while the Real Transit proposal recommends purchasing "specially designed powerful buses able to negotiate Hayward's hillside terrain much more rapidly than AC Transit's . . . buses." Respondents argue that the Real Transit shuttle would significantly reduce travel time between BART and the campus and that the Trustees should have calculated the potential increase in ridership that could be generated by reducing travel times. The record, however, does not support respondents' assertion that use of the proposed new powerful busses would significantly reduce travel times or increase transit use.

Respondents estimate that the new buses would take 16 minutes for a round trip, running on a 10-minute headway,[10] for a maximum one-way trip of 18 minutes, and they estimate that round trips on AC Transit would take 24 minutes, running on a 15-minute headway. As the Trustees point out, this estimate relies on incorrect data. Under the TDM program analyzed in the final EIR, headways for the AC Transit buses were reduced to six to seven minutes during peak commute hours. Thus, the AC Transit service also provides a maximum one-way trip time of about 18 to 19 minutes. Absent a meaningful difference in travel time, the Trustees reasonably concluded the proposed purchase of new buses would not have a significant impact on transit use.

Respondents' argument that use of the Real Transit shuttle would eliminate the need for new on-campus parking is similarly flawed. The Trustees note correctly that respondents' argument considers only whether the proposed shuttle can replace the 1300 cars that will park in the proposed parking structure and fails to take into account the parking and transit needs of the campus as a whole. The EIR makes clear that the new

---

[10] "Headway" is "the time interval between two vehicles traveling in the same direction on the same route." (Merriam-Webster's New Collegiate Dictionary (11th ed. 2007) p. 574.)

27

parking structure is designed to replace some existing parking spaces that will be removed as part of the campus development and to provide the additional spaces needed to satisfy a portion of the new population. As discussed above, the Trustees are committed to reducing by half the number of new students who commute to campus by single-occupancy vehicle, but the EIR nonetheless anticipates an increase in the demand for parking.[11] Respondents do not assert that the new busses proposed as part of the Real Transit plan would generate more than the 50 percent increase in transit riders which is the minimum goal of the TDM plan. Hence, there is no basis for the contention that the Real Transit plan would eliminate the need for any new parking.

In short, we find no deficiency in the manner in which the EIR considers the impact of the master plan on parking and traffic, incorporates mitigation measures, and reaches the conclusion that some impact is unavoidable. For the same reasons, we reject the trial court finding that the project-level EIR for the parking structure was deficient in failing to consider the Real Transit proposal as a project alternative. Likewise, we find no error with respect to the adoption by the Trustees of a statement of overriding considerations with respect to the remaining unmitigated impacts.

      c.      <u>Funding for Traffic Mitigation at Off-Campus Intersections</u>

Having found that buildout under the master plan would result in cumulatively significant impacts to off-campus intersections, the Trustees calculated the University's

---

[11] As explained in the EIR, "[T]he Draft EIR analysis indicates that even a 50 percent increase in the *rate* of transit use, as the campus grows, would not be sufficient to completely eliminate the need for some new parking at Master Plan buildout, because the campus population will more than double, while surface parking lots will shrink due to new academic and residential buildings." The record establishes that the "proposed Master Plan projects the need for up to 8,750 parking spaces, which would be an increase of about 3,900 spaces over the inventory available in January 2007. . . . This projection conservatively assumes that current commuting mode choice characteristics would continue. However, rather than assuming future parking demand and resulting supply needs will mimic past trends, the Master Plan parking plan proposes to carefully grow the parking supply while managing the growth in parking demand, with the goal of cutting growth by approximately 50 percent. Thus, rather than adding 3,900 spaces to the current 4,800, the addition is proposed to be 1,900, for a maximum of 6,700 spaces."

fair-share contribution to mitigate those impacts at approximately $2 million. The Trustees have consistently recognized the University's obligation to pay its fair share of the cost of off-site traffic mitigation measures and engaged in lengthy, albeit unsuccessful negotiations with the city to calculate the estimated mitigation expenses. The resolution adopted by the Trustees in conjunction with the certification of the EIR recognizes that the Trustees are obligated to "pursue mitigation funding from the Legislature to meet its CEQA fair share mitigation obligations" and directs the University's Chancellor to "request from the Governor and the Legislature, through the annual state capital budget process, future funds in the amount of $2,331,618 necessary to support the fair share mitigation costs as projected in the [EIR]." Recognizing, however, that the request may be denied, the Trustees also found that "the impacts whose funding is uncertain remain significant and unavoidable and that they are necessarily outweighed by the statement of overriding considerations adopted by this board." The trial court found this inadequate, explaining, "It is error to conclude . . . that [the Trustees are] not obligated to mitigate a significant effect consequent to a CEQA project simply because the Legislature declined to fund mitigation while otherwise funding the project."

Respondents contend the Trustees have not satisfied their obligation under CEQA by merely asking the Legislature for mitigation funding. They argue that "Nowhere does CEQA create an exception [to the requirement to commit to fund mitigation costs] for any agency that does not have sufficient funds to pay for mitigation." Public Resources Code section 21002.1, subdivision (b) provides that "Each public agency shall mitigate or avoid the significant effects on the environment of projects that it carries out or approves whenever it is feasible to do so." In *City of Marina v. Board of Trustees of California State University*, *supra*, 39 Cal.4th at pages 359-360, the court held that voluntary mitigation payments for off-site impacts are one means by which a public agency can satisfy this requirement. Those payments, however, are not mandatory and are required only to the extent they are feasible. (*Ibid.*) The Trustees determined that the payments were feasible only if approved by the Legislature. Nothing in CEQA requires the Trustees to commit to a mitigation measure that is not feasible.

29

Respondents argue that the Trustees' reliance on a legislative appropriation to determine the feasibility of paying for the mitigation measures "ignores the fact that it has alternative funding available to it." In our prior opinion we noted the potential merit of this argument, citing a recent decision by Division One of the Fourth Appellate District but noting that the Supreme Court had granted review in that case just prior to oral argument in this case. (*City of San Diego v. Board of Trustees of California State University*, review granted April 18, 2012, S199557.) We concluded, however, that because respondents had failed to make such a contention in the administrative proceedings or in the trial court, the issue had been waived on appeal.

In *City of San Diego v. Board of Trustees of California State University*, *supra*, 61 Cal.4th 945, 950, the Supreme Court rejected the Trustees' argument that a state agency may contribute funds for off-site environmental mitigation *only* through earmarked appropriations, to the exclusion of other available sources of funding. The court found that the Trustees's reliance on this "erroneous assumption" invalidated both the Trustees' finding that mitigation is infeasible and its statement of overriding considerations. (*Ibid*.) The court emphasized the importance of the Trustees' duty to mitigate its projects' environmental effects: "[N]o provision of CEQA conditions the duty of a state agency to mitigate its projects' environmental effects on the Legislature's grant of an earmarked appropriation. Mitigation is the rule: 'Each public agency shall mitigate or avoid the significant effects on the environment of projects that it carries out or approves whenever it is feasible to do so.' " (*Id* at pp. 960-961.)

In its brief submitted following remand, the Trustees state that it "acknowledges and values the guidance the California Supreme Court provided in *City of San Diego* as to CSU's CEQA obligations with respect to the funding of off-site mitigation measures, and [it] is working to ensure all future CSU projects are consistent with the Supreme Court's directions." Given the increased clarity provided by the *City of San Diego* decision, we affirm the trial court's judgment insofar as it requires reconsideration of the

feasibility of funding the University's fair-share contribution as a mitigation measure.[12] Although the issue was not fully presented when the adequacy of the EIR was before the Trustees, in view of the clarification provided by *City of San Diego* and the scope and public importance of the project in question, it is appropriate for the Trustees to heed the Supreme Court's guidance with respect to this project, especially since the matter must in all events be remanded for further consideration of the parkland issue discussed, *infra.*

4.    *Impacts on Air Quality*

The EIR includes a section on air quality that "presents the existing air quality conditions in the project area" and "evaluates the types and quantities of air emissions that would be generated over the long term due to campus operation and from ongoing construction on the campus under the proposed campus Master Plan." Among other findings, the EIR determines that "Campus development under the proposed Master Plan would generate long-term operational emissions of criteria pollutants that would exceed the [Bay Area Air Quality Management District] thresholds." The EIR finds that mitigation measures, including primarily implementation of the TRANS-1 mitigation measure, would reduce emissions, noting however that "It is not possible to calculate the full extent of the reductions based on these measures as it would depend upon the participation level of the recommended carpool and mass-transit programs." The EIR concludes that while some emission types could be fully mitigated, for others impacts would remain significant and unavoidable despite proposed mitigation. With respect to the remaining impacts, the Trustees adopted a statement of overriding considerations.

The trial court found that the EIR's "evaluation and analysis fail because they are substantially founded upon the premise that the TRANS-1a mitigation measure will lead to a specific result" and that as the court "has determined that TRANS-1a is illusory as a mitigation measure . . . it follows that the EIR analysis of air quality impacts found upon an illusory mitigation measure is not adequate." As discussed above, however, we have rejected the conclusion that the TRANS-1a mitigation measure is illusory. The record

_____

[12]  The Trustees' motion to strike the argument in respondents' brief is denied.

supports the conclusion in the EIR that implementation of the transportation mitigation measures will reduce some but not all emissions to a less than significant level. Neither the trial court nor respondents suggest further mitigation measures (other than the Real Transit alternative discussed above) that should have been considered. Accordingly, the Trustees should not be directed to reconsider this portion of the EIR, nor is there a basis to disturb the adoption of the statement of overriding considerations on this issue.

5.      *Impacts on Parklands*

The EIR concludes that "[t]he proposed Master Plan would not result in impacts to parks or other recreational facilities."[13] The EIR explains, "At buildout of the proposed Master Plan, the Hayward campus is intended to accommodate an enrollment of 18,000 [full-time equivalent students]. The increased student population would likewise increase the use of campus athletic and recreational facilities. Under the proposed Master Plan, existing recreational and athletic facilities would be maintained. . . . [¶] Implementation of the proposed Master Plan is not expected to increase the use of neighborhood or regional parks or other recreation facilities in the project area . . . . Use of off-campus recreational resources by the additional students and potential resident faculty and staff would be nominal because on-campus facilities would adequately support the campus population." The EIR similarly finds that no project-level analysis of impacts to parkland is required with respect to the student housing facility project.

The trial court found this analysis deficient in that it fails to evaluate potential impacts to two neighboring parks, Garin Regional Park and Dry Creek Pioneer Regional Park. Garin park borders the south side of the Hayward campus and is accessed from campus via an unpaved service road originating near the student housing area. Dry Creek connects to Garin opposite the campus. Together, Garin and Dry Creek make up 4,763 acres of parkland, offering 20 miles of trails for hikers, mountain bikers, and horseback

---

[13] The standard of significance applied in the EIR to evaluate potential parkland impacts is whether the proposed development would "increase the use of existing neighborhood and regional parks . . . such that substantial physical deterioration of the facility would occur or be accelerated."

riders.[14]  Despite the proximity of these regional parks to the campus, the EIR does not address potential impacts to these parks specifically, but refers only to insignificant impact on the entire East Bay Regional Park District.  The Trustees argue that the EIR analysis is sufficient because it is reasonable to conclude that the increased student population, including the 600 new occupants of the proposed student housing project, would make the same "nominal' use of these parks "consistent with long-standing use patterns" and because the master plan includes ample on-campus recreation offerings.  Like the trial court, we disagree.

The Trustees' argument rests on the premise that the "long-standing use patterns" of students on the neighboring parks is nominal, but there is no factual evidence to support this assumption.  There are currently 12,586 full-time equivalent students enrolled at the University.  The EIR discloses no attempt to determine the extent to which these students make use of the adjacent parklands or to extrapolate from such data estimated increased usage by the additional approximately 5,500 anticipated full-time equivalent students.  Nor was any such calculation made for the existing approximately 1,200 residential students and the 600 students anticipated to live in the new student housing project.  Moreover, the record contains no evidence regarding overall usage or capacity of the neighboring parks.  As the trial court noted, evaluating the potential impact on the entire East Bay Regional Park District casts too broad a net and does nothing to expose potential impacts on the neighboring parks.

The fact that there is ample on-campus recreation opportunities does not support the finding that additional use of the nearby regional parks will be "nominal."  The types of recreational opportunities offered on campus and in the neighboring parks are significantly different.  The athletic fields, recreation center, swimming pool and grassy fields found on campus are not comparable to the recreational opportunities available in the 4,763 acres of neighboring parkland.  Without any data concerning the extent to

---

[14]  Respondents' request for judicial notice of "the fact that Garin Regional Park contains significant wildlife and historic resources" is denied on the ground of relevancy.

33

which the current-size student body (or anybody else) utilizes the adjacent parks, it is not reasonable to assume that the "informal trails" available on the 130-acre open space reserve on campus will keep significant numbers of new students from making use of the neighboring parklands.[15]

Thus, we agree with the trial court that the EIR fails to meaningfully inform or analyze the extent of the impact the master plan is likely to have on the neighboring parklands.

### Disposition

The judgment is reversed except to the extent it requires the Trustees, before considering certification of a revised EIR, to revise the analysis of the impacts of the master plan and related site-specific projects to parkland and to reconsider its feasibility findings with respect to funding of off-site mitigation measures. The pending appeals from the attorney fee orders (Nos. A132423 and A132424) are consolidated with the present appeal and the orders reversed and remanded for further proceedings. Each party shall bear its own costs on appeal.

_____
Pollak, Acting P.J.

We concur:


_____
Siggins, J.


_____
Jenkins, J.

---

[15] Respondents' motion to strike attachment A to appellants opening brief is granted. The municipal code attached to the brief, which contains the city's "standards for parkland dedication" is irrelevant.

34

| | |
|---|---|
| Trial court: | Alameda County Superior Court |
| Trial judge: | Honorable Frank Roesch |
| Counsel for plaintiff and respondent City of Hayward: | Harriet A. Steiner Kara K. Ueda BEST BEST & KRIEGER LLP |
| | Randolph Stevenson Hom Michael S. Lawson Office of the City Attorney |
| Counsel for plaintiffs and respondents Hayward Area Planning Association and Old Highlands Homeowners Association: | Stuart M. Flashman |
| Counsel for defendant and appellant Board of Trustees of the California State University: | Diana K. Hanna Christine W. Griffith Corinne I. Calfee SSL Law Firm, LLP |

A131412, A131413, A132423, A132424